IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BENSON GITHIEYA, KATE          :
BOCCIA, DARLENE BYERS, and     :
NELLIE LOCKETT,                :
                               :
    Plaintiffs,                :
                               :
    v.                         :          CIVIL ACTION NO.
                               :          1:15-CV-986-AT
GLOBAL TEL*LINK CORP.,         :
                               :
    Defendant.                 :

## ORDER

This matter is before the Court on Defendant Global Tel*Link Corporation's ("GTL") Motion to Dismiss Plaintiffs' Second Amended Complaint [Doc. 79]. This is a proposed class action suit. GTL is a communications company that provides inmate calling services around the United States. Plaintiffs are friends and family members of inmates who set up prepaid accounts with GTL to facilitate telephone communication with their incarcerated loved ones. Plaintiffs specifically challenge GTL's "inactivity policy" (which is described below) and bring state-law claims of breach of contract and unjust enrichment as well as violations of the Federal Communications Act ("FCA"), 47 U.S.C. § 201 *et seq*.

## I. PROCEDURAL BACKGROUND

Plaintiff Benson Githieya, the sole plaintiff at the time, filed the initial proposed class action complaint in this case on April 3, 2015. (Doc. 1.) The Court

then stayed and administratively closed the case on January 25, 2016 upon granting Defendant's motion to compel arbitration.  (Doc. 23.)  On March 16, 2017, the case was reopened after the arbitrator found that the case was not subject to mandatory arbitration.  (Doc. 28.)

Plaintiffs filed the Second Amended Complaint on October 23, 2017 (Doc. 72), which added three named plaintiffs, and Defendant filed the instant Motion to Dismiss on November 22, 2017.  Plaintiffs filed a Motion for Leave to File a Sur-Reply in Opposition to Defendant's Motion to Dismiss [Doc. 102] and a Motion for Leave to Supplement the Record, or, in the Alternative, to Amend Their Complaint [Doc. 105], and both sides have filed related motions to seal.  On June 25, 2018, Plaintiffs filed a Motion to Certify Class [Doc. 122].

The Court addresses Defendant's Motion to Dismiss and all related filings in this Order.  The Court will address Plaintiffs' Motion to Certify Class in a separate order.

## II. FACTUAL BACKGROUND[1]

GTL is a Delaware corporation that, through its wholly owned subsidiaries, provides inmate calling services throughout the United States.  (Second Am. Compl., Doc. 72 ¶¶ 17-18.)  GTL and its subsidiaries serve over 2,200 correctional facilities in the United States in 48 states.  (*Id.* ¶ 19.)  Plaintiffs bring this case as a

---

[1] The Court derives the factual background herein from Plaintiffs' Second Amended Complaint, which the Court presumes true for purposes of resolving Defendant's Motion to Dismiss.  *See Duke v. Cleland*, 5 F.3d, 1399, 1402 (11th Cir. 1993).

proposed class action based on their calling service accounts with GTL. The Plaintiffs – Benson Githieya, Kate Boccia, Darlene Byers, and Nellie Lockett – are individuals who opened "AdvancePay" accounts with GTL between 2009 and 2014 to facilitate communication with their incarcerated family members and friends. (*Id.* ¶¶ 1-16.)

**GTL's AdvancePay Accounts**

Plaintiffs allege that they suffered losses when GTL applied its "inactivity policy" to their AdvancePay accounts. (*Id.* ¶¶ 1-16.) GTL's AdvancePay account system allows a customer to deposit funds into a prepaid account for the purpose of receiving calls from inmates at correctional facilities that contract with GTL. (*Id.* ¶ 36.) GTL then holds the funds in the account in order to pay for calls that a customer receives from an inmate. (*Id.* ¶ 38.) Thus, when an incarcerated individual calls a customer, funds are deducted from the prepaid account.

Each Plaintiff here deposited money into an AdvancePay account by entering his or her credit card information over the phone into the interactive-voice-response ("IVR") system. (*Id.* ¶ 34.) The IVR system is automated and offers customers the option to deposit $25 or $50 into their accounts.[2] (*Id.* ¶ 37.) Plaintiffs allege that the IVR's automated voice "may have referred to 'terms of use,' but did not state the 'terms of use.'" (*Id.* ¶ 40.) The automated system did not require Plaintiffs to affirmatively accept any terms of use prior to establishing an

---

[2] Account holders can also deposit "additional amounts during certain time periods." (Second Am. Compl., Doc. 72 ¶ 37.)

account, either vocally or by pressing a button.  (*Id.* ¶¶ 41-42.)  During the time Plaintiffs maintained their AdvancePay accounts, GTL was the exclusive provider of inmate calling services for thousands of correctional facilities in the country. (*Id.* ¶ 83.)

**GTL's "Inactivity Policy"**

If a GTL AdvancePay account does not see any activity for a period of 90 or 180 days,[3] GTL classifies the account as "inactive," reduces any outstanding balance to $0.00, and converts these unused funds to revenue for GTL.[4]  (*Id.* ¶¶ 45-46.)  Plaintiffs claim that GTL never informed them that it would reduce their account balances to $0.00 after a period of inactivity when they first established AdvancePay accounts.  (*Id.* ¶¶ 79, 81.)  Further, the published webpage "terms of use" contained no notice that a customer's funds would be reduced to $0.00 after an inactivity period.  (*Id.* ¶ 82.)  Thus, Plaintiffs allege that this "inactivity policy" constituted a taking of their funds that they were never informed of and never agreed to.  (*Id.* ¶¶ 80-81.)

---

[3] It is unclear at this stage why GTL would classify an account as inactive at *either* 90 days or 180 days, but this is how Plaintiffs allege GTL applied its inactivity policy in the Second Amended Complaint.
[4] Plaintiffs' allegations are discussed in the present tense, as they allege that GTL's inactivity policy is ongoing.  (*Id.* ¶¶ 45, 78, 125.)

**Plaintiffs' Claims**

Plaintiffs bring claims for breach of contract (Count I), unjust enrichment (Count II), and violations of the Federal Communications Act ("FCA"), 47 U.S.C. § 201, *et seq.* (Count III).

In their Count I contract claim, Plaintiffs allege that GTL entered into contracts with the them and that these contracts were formed as a result of Plaintiffs' use of GTL's automated IVR system when establishing their AdvancePay accounts. (*Id.* ¶¶ 101-102.)  Specifically, Plaintiffs assert that GTL expressly or implicitly agrees to hold a customer's funds until they are needed to pay for a call with an inmate.  (*Id.* ¶ 105.)  Each Plaintiff opened and funded a prepaid account in exchange for such a service.  (*Id.* ¶ 106.)  These alleged contracts, between Plaintiffs and GTL, included no express or implicit terms that permit GTL to take a customer's prepaid funds and treat such funds as revenue (a practice Plaintiffs refer to as "breakage") after a 90- or 180-day period of inactivity.  (*Id.* ¶ 107.) Plaintiffs further allege that, even if there was a "term" allowing GTL to take prepaid funds, it would be unenforceable as a matter of law as an unlawful penalty. (*Id.* ¶ 108.)  Consequently, Plaintiffs allege they suffered damages from GTL's breach of these express or implied contracts.  (*Id.* ¶¶ 109-110.)

In the alternative to their contract claim, Plaintiffs bring a claim of unjust enrichment.  (*Id.* ¶ 112.)  Plaintiffs allege that they conferred a substantial benefit on GTL in the form of prepaid amounts deposited with, and later taken by, GTL. (*Id.* ¶ 113.)  Plaintiffs further allege that GTL "deliberately sought to prevent

Plaintiffs and the Class members from discovering the policy and practice." (*Id.* ¶ 117.) Plaintiffs seek disgorgement and restitution of amounts wrongfully obtained pursuant to this "unjust policy and practice." (*Id.* ¶ 119.)

Next and finally, Plaintiffs assert a claim for violations of the FCA. Plaintiffs allege that GTL (a common carrier engaged in interstate commerce) violated the FCA's requirement that all "charges, practices, classifications, and regulations" be just and reasonable. (*Id.* ¶¶ 20, 121, 122) (citing 47 U.S.C. § 201(b).) Any such "charge, practice, classification or regulation" that is unjust or unreasonable is declared unlawful. (*Id.*) GTL's "inactivity policy," according to Plaintiffs, is unjust and unreasonable – and thus unlawful. (*Id.* ¶ 123.) Noting that the FCA allows an individual to *either* make a complaint to the Federal Communications Commission ("FCC") *or* bring suit in district court, Plaintiffs assert that because none of them has made a complaint to the FCC, they have standing to bring an FCA claim in district court. (*Id.* ¶¶ 125-126) (citing 47 U.S.C. § 207) (emphasis in Complaint.) Plaintiffs ask the Court to permanently enjoin GTL from continuing its "inactivity policy" and to award damages to Plaintiffs for the amounts removed from their accounts, as well as reasonable attorney's fees and further relief deemed necessary. (*Id.* ¶ 129.)

## III.   STANDARD FOR MOTION TO DISMISS

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-556 (2007); Fed. R. Civ. P. 12(b)(6). The plaintiff

need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)); Fed. R. Civ. P. 8(a). In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is not required to provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Id.* at 556. A complaint may survive a motion to dismiss for failure to state a claim even if it is "improbable" that a plaintiff would be able to prove those facts and even if the possibility of recovery is extremely "remote and unlikely." *Id.*

## IV.   ANALYSIS

As an initial matter, Plaintiffs argue that GTL's Motion to Dismiss should be denied as procedurally improper because GTL answered Plaintiffs' First Amended Complaint and because GTL's motion "strays well beyond the pleadings." (Pl.

Resp., Doc. 91 at 7-9.)  The Court finds that GTL's instant Motion to Dismiss is procedurally proper.  As a matter of law, an amended complaint supersedes the former pleadings; the original pleadings are abandoned by the amendment. *Hoefling v. City of Miami*, 811 F.3d 1271, 1271 (11th Cir. 2016).  Here, upon Plaintiffs' filing of their Second Amended Complaint, the First Amended Complaint became a legal nullity, mooting GTL's initial Answer.  *Id.* at 1277; *see also SMH Int'l Corp. v. Guangdong Chant Grp., Inc.*, 2016 WL 4204553 at *4 (N.D. Ga. June 29, 2016) (finding defendant's motion to dismiss second amended complaint procedurally proper where defendant had filed Answers to complaint and amended complaint).

The Court further notes that both parties have included information in their briefs outside the scope of the pleadings.[5]  This reality does not necessarily make GTL's motion improper.  At the motion to dismiss stage, the Court will look beyond the pleadings to consider matters of public record, for example.  *Trustmark Ins. Co. v. ESLU, Inc.*, 153 F. Supp. 2d 1322, 1325 (M.D. Fla. 2011), *aff'd*, 299 F.3d 1265 (11th Cir. 2002).  As such, the Court has considered GTL's filed tariffs (Def. Mot. to Dismiss, Doc. 79, Ex. 2) and the FCC's *Second Report and Order and Third*

---

[5] Plaintiffs argue that GTL "makes much of its purported (unwritten) refund practice, even though the practice does not appear in the complaint." (Pl. Resp., Doc. 91 at 9.)  GTL argues that Plaintiffs rely on extra-pleading materials as their brief is "littered with references to deposition testimony." (Def. Reply, Doc. 101 at 5.)

*Further Notice of Proposed Rulemaking* ("2015 FCC Order," Doc. 91-1, Ex. 1),[6] in making its determination.

As another preliminary matter, the Court addresses Plaintiffs' Motion for Leave to File a Sur-Reply [Doc. 102].  Plaintiffs argue that GTL's Reply brief raises new arguments concerning the validity and contents of the above-referenced 2015 FCC Order, which GTL did not discuss in its Motion to Dismiss.  (FCC Order, Doc. 91-1.)  In their proposed Sur-Reply, Plaintiffs only address these new arguments related to GTL's interpretation of the 2015 FCC Order.  In opposition, Defendant argues that no sur-reply is warranted because GTL raised no new arguments in its Reply; it simply responded to arguments in Plaintiffs' response brief.  (Def. Resp. to Mot. for Sur-Reply, Doc. 104 at 2) (citing *Roelle v. Cobb County Sch. Dist.*, 2014 WL 4457235 at *9 (N.D. Ga. Sept. 10, 2014).)

Upon review, the Court **GRANTS** Plaintiffs' Motion to File a Sur-Reply [Doc. 102].  It is true that GTL's Reply raises new arguments regarding the 2015 FCC Order.  Plaintiffs should have the opportunity to respond to these new arguments.  *Atlanta Fiberglass USA, LLC v. KPI, Co.*, 911 F. Supp. 2d 1247, 1262 (N.D. Ga. 2012) (Story, J.) (stating that sur-replies will generally be permitted where a movant raises new arguments or facts in a reply brief).  Furthermore, the 2015 FCC Order is much debated between the parties, and its contents and procedural posture are relevant to multiple issues presently before the Court.

---

[6] *In the Matter of Rates for Interstate Inmate Calling Services*, 30 FCC Rcd. 12763, 12775-76, 12838-62 (November 5, 2015), 80 Fed. Reg. 79136-01 (Dec. 18, 2015).

Allowing the parties to more fully brief the issues involving the 2015 FCC Order only aids the Court's analysis of GTL's Motion to Dismiss.  The Court therefore considers Plaintiffs' Sur-Reply in ruling on the Motion to Dismiss.

The Court now turns to the multiple substantive issues of the instant Motion to Dismiss.

**A. Plaintiffs' FCA Claim (Count III)**

**1. Private Right of Action: Alleging Interstate Communication**

Plaintiffs claim that Defendant's inactivity policy violates the FCA because it is unjust and unreasonable.

The relevant portion of the FCA states:

> (a)    It shall be the duty of every common carrier *engaged in interstate or foreign communication* by wire or radio to furnish such communication service upon reasonable request therefore . . . .

> (b)    All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . .

47 U.S.C. § 201 (emphasis added).  In essence, Plaintiffs here challenge a "practice" under Section 201(b) that is allegedly connected to "interstate [] communication" as stated under Section 201(a).  The practice at issue is GTL "unilaterally taking money" from the prepaid accounts it provides to customers.  (Pl. Resp., Doc. 91 at 29.)  The "communication" (which that practice is connected to) is any calls that did take place, and would have taken place, between the individual Plaintiffs and inmates based on available funds in the accounts.

Defendant argues that Plaintiffs' FCA claim fails because Plaintiffs do not specifically allege that any calls they received (or could not receive) were "*inter*state, rather than *intra*state, in nature." (Def. Mot. to Dismiss, Doc. 79 at 19.) Because all Plaintiffs reside in Georgia and Plaintiffs "seem to suggest" they were only communicating with inmates housed in Georgia, Defendant argues that the FCA does not apply here. (*Id.* at 20.)

In their Response, Plaintiffs argue that they are not required to plead specific interstate calls and that they have sufficiently alleged that a common carrier imposed unjust or unreasonable charges, as required by the statute. Plaintiffs also emphasize that their claims are not about specific calls; rather, they are challenging GTL's practice of taking funds from prepaid accounts that are capable of receiving both interstate and intrastate calls.

The FCA defines "interstate communication" as a "communication or transmission . . . from any State . . . to any other State . . . ." 47 U.S.C. § 153(h)(22). The FCA does not govern purely intrastate communications. 47 U.S.C. § 152(b) ("Nothing in this chapter shall be construed to apply to or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier."); *see also MetroPCS Cal., LLC v. FCC*, 644 F.3d 410, 413 (D.C. Cir. 2011) (holding that the FCA "grants the FCC authority over interstate communications but reserves wholly intrastate matters for the states"); *Global Tel\*Link v. FCC*, 866 F.3d 397, 415 (D.C. Cir. 2017) (stating that although the FCC

has plenary authority to regulate interstate rates and practices, it does not have authority to regulate intrastate rates and practices); *In the Matter of Vonage Holdings Corp.*, 19 F.C.C. Rcd. 22404, 22413 ¶ 17 (2004) ("Section 2(b) of the Act reserves to the states jurisdiction with respect to intrastate communication service . . . of any carrier.") (internal quotations omitted).

Courts (as well as the FCC) have applied an "end-to-end jurisdictional analysis" to determine whether the communication at issue is interstate, as opposed to intrastate, and therefore falls within the FCA's scope.  The analysis "focuses on the 'end points' of a telephone call and considers the continuous path of communications beginning with the end point at the inception of a communication to the end point at its completion."  *McClure Tel. Co. v. AT & T Commc'ns of Ohio, Inc.*, 650 F. Supp. 2d 699, 705 (N.D. Ohio 2009) (citing *Nat'l Assoc. of Regulatory Utility Commissioners v. Federal Comm's Commission*, 746 F.2d 1492, 1498–99 (D.C. Cir. 1984)).  Put differently, if a call originates in one state and is ultimately received in another state, the call is considered interstate communication.

Here, only one "end point" is identifiable based on the Second Amended Complaint – the individual Plaintiffs residing in Georgia.  The other end point is unknown.  The Second Amended Complaint does not specify that Plaintiffs' account money had been used to pay for actual calls to inmates housed outside of Georgia, nor does it specify that Plaintiffs intended to use their account money (before it was withdrawn by GTL) to receive calls from inmates housed outside of

Georgia. Without more, the current allegations do not appear to show that Plaintiffs' FCA claim involves "interstate communication."

Plaintiffs emphasize that their FCA claim is about prepaid accounts, not individual calls, and that the accounts are capable of receiving both interstate and intrastate calls. While this is true, 47 U.S.C. § 201 suggests that Plaintiffs must still allege that these prepaid accounts were serviced "in connection with" interstate communication to state a claim. The question is whether Plaintiffs have sufficiently pled that the "calls in question" in this case (i.e., actual or intended calls between the individual Plaintiffs and inmates) include interstate calls. *McClure*, 650 F. Supp. 2d at 707. Several courts assessing this same sort of jurisdictional question have focused the end-to-end analysis on the specifically alleged calls – "to determine whether *particular* traffic is interstate." *Bell Atlantic Telephone Companies v. F.C.C.*, 206 F.3d 1, 4 (D.C. Cir. 2000) (emphasis added); *see also Norris v. Glob. Tel Link Corp.*, No. 16-CV-11323-LTS, 2018 WL 1318922, at *2 (D. Mass. Mar. 14, 2018) ("Norris therefore has no legal basis under the FCA to challenge GTL's rates and fees for calls that Norris made from Massachusetts to persons in Massachusetts. Norris has not alleged any calls to persons outside of Massachusetts."); *Jacobs v. Glob. Tel*Link Corp.*, No. 5:15-CV-5136, 2016 WL 5953128, at *2 (W.D. Ark. May 17, 2016) ("Plaintiffs contend that Defendant has charged them unjust and unreasonable rates for intrastate inmate calling services in violation of the FCA . . . . The Court is persuaded that the plain language of the FCA does not, of its own force, prohibit common carriers from charging

exploitative rates to end users of inmate calling services for purely intrastate calls.")  Even in the case cited by Plaintiffs, there was no question that the telephone communications at issue were interstate in nature.  *National Ass'n of Regulatory Utility Com'rs v. FCC*, 746 F.2d 1492, 1500 (D.C. Cir. 1984) ("[I]t is undisputed that the intrastate WATS connections sought here would be used to terminate communications which originate in other states.") (internal quotations omitted).  Put differently, Plaintiffs have alleged that GTL is a common carrier, operating in 48 states to provide inmate calling services, and that GTL is engaged in interstate commerce, but it remains unclear whether Plaintiffs have alleged that the calls (or thwarted calls) in this case involve communication that crossed state lines.

At this point, the Court need not resolve as a matter of law the specific pleading requirements to satisfy the interstate jurisdictional question under the FCA.  Rather, the Court simply finds that, based on the current pleadings, Plaintiffs have not alleged sufficient facts showing "interstate communication" to state a claim under the FCA.  The Court further notes that Plaintiffs represent in their briefing that they stand ready to allege that "certain Plaintiffs did, in fact, actually receive [(or intend to receive) interstate calls before their money was taken."  (Pl. Resp., Doc. 91 at 31.)  The Court has no reason to doubt the veracity of Plaintiffs' representation on this point.  Thus, out of an abundance of caution, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' FCA claim and **GRANTS LEAVE TO AMEND** this claim.  Specifically, Plaintiffs have leave to add

allegations regarding the interstate nature of communications involving Plaintiffs'

prepaid accounts.  Should Plaintiffs wish to pursue their FCA claim, the Court

**DIRECTS** Plaintiffs to amend their Complaint no later than September 28, 2018

in accordance with this Order.[7]

---

[7]     In addition to briefing this issue, Plaintiffs filed a Motion for Leave to Supplement the Record or, In the Alternative, to Amend Their Complaint [Doc. 105].  In part, Plaintiffs seek to include the deposition of GTL's corporate designee, Christopher McNitt, whose testimony shows the geographic journey a particular GTL call takes when an inmate places a call to an AdvancePay account holder — a journey involving data transmission across state lines, even if the recipient of the call is in the same state as the inmate.

Defendant correctly argues in response that the "end-to-end" analysis under the FCA focuses on the beginning and end point of a call and does not divide communications at intermediate points of switching. *Bell Atlantic Telephone Companies v. F.C.C.*, 206 F.3d 1, 4 (D.C. Cir. 2000); *McClure Tel. Co. v. AT&T Commc'ns of Ohio, Inc.*, 650 F. Supp. 2d 699, 705-06 (N.D. Ohio 2009).  Thus, if a call both originates and ends in the same state – regardless of whether the communication traveled across state lines to connect those two end points – the call is considered to be intrastate.  The Court therefore finds Plaintiffs' Motion to be extraneous and an incorrect application of the law with respect to Mr. McNitt's testimony about the interstate journey of GTL calls.

However, Plaintiffs also request to amend their pleadings to add allegations that individual Plaintiffs opened GTL prepaid accounts "with the intention to receive interstate calls." (Pl. Mot. to Supp., Doc. 105 at 6.)  As discussed in this section, the Court has decided to permit such amendment.  The Court also notes that Plaintiffs represent some of them were unable to receive calls from inmates before GTL withdrew the funds from their prepaid accounts under the inactivity policy.  Given this situation, the Court understands that individual Plaintiffs may not be able to allege that they actually received interstate calls but that they *intended* to receive interstate calls – based on their particular friend or relative being incarcerated in another state – before their accounts were emptied.  Moreover, upon amending the pleadings, Plaintiffs should include particularized information as to the facility location of the incarcerated friend or relative.

Accordingly, Plaintiffs' Motion to Supplement or Amend [Doc. 105] is **GRANTED IN PART** and **DENIED IN PART**.

Additionally, as part of their Motion to Supplement or Amend, Plaintiffs asked the Court to lift the seal on excerpts of Mr. McNitt's deposition testimony referenced in the Motion. Defendant opposed lifting the seal, arguing that Mr. McNitt's testimony contained proprietary and sensitive information and trade secrets.  Upon review of the deposition excerpts, the Court finds that Defendant has not sufficiently shown how the information in Mr. McNitt's deposition warrants protection from public view.  Mr. McNitt simply discusses how GTL facilitates calls made from inmates (in public facilities) to individuals on the outside.  Defendant has not shown how this information reveals trade secrets or particularly sensitive information that is not already known in the industry or accessible to the public.  The Court therefore **GRANTS** Plaintiffs' Motion to Lift the Seal [Doc. 106] and **DENIES** Defendant's Motion to File a Response Under Seal [Doc. 110].

### 2.  Other Issues Affecting a Potential FCA Claim

Though the Court has dismissed without prejudice Plaintiffs' FCA claim at this juncture, the Court suspects that Plaintiffs will be able to remedy this defect based on their above-discussed representations.   Therefore, the Court now considers Defendant's additional arguments pertaining to Plaintiffs' FCA claim. The Court does so to head off unnecessary motion practice in the event that Plaintiffs amend with allegations plausibly indicating that interstate end-to-end calls were indeed received (or intended to be received) by one or more of the Plaintiffs.

### a.  Primary Jurisdiction Doctrine

The Court turns to GTL's argument that the case should be referred to the FCC under the primary jurisdiction doctrine. [8]  This doctrine applies when a claim that originates in the courts requires the resolution of issues which have been placed within the special competence of an administrative agency.  *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290 (1976).  Courts have discretion in deciding whether or not to exercise jurisdiction under the doctrine.  Indeed, the primary jurisdiction doctrine is "a flexible concept" with the purpose of "integrat[ing] the regulatory functions of agencies into the judicial decision making process . . . ." *Columbia Gas Transmission Corp. v. Allied Chem. Corp.* 652 F.2d 503, 519 n. 14

---

[8] The Court notes (as did Plaintiffs) the tension in GTL arguing, on one hand, that this case is not within the purview of the FCC because it does not involve interstate communication, and on the other hand, arguing that this case should be sent to the FCC under the primary jurisdiction doctrine.

(5th Cir. 1981).  The doctrine "does not require that all claims within an agency's purview be decided by the agency.  Nor is it intended to 'secure expert advice' for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit."  *Brown v. MCI WorldCom Network Services, Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002).

Defendant GTL argues that this case should be sent to the FCC because (1) the question of whether the inactivity policy is unreasonable is one for telecommunications regulators and (2) allowing suit instead of referring the case to the FCC raises the danger of inconsistent adjudications.

Plaintiffs, on the other hand, argue against a referral to the FCC because (1) the FCC has already spoken on this issue and outlawed GTL's inactivity policy; (2) the challenged practice does not require the expertise of the FCC; and (3) GTL has substantially delayed in seeking referral.

The Court first addresses the issue of whether the FCC has spoken on this issue.  While GTL argues that the FCC has not indicated disapproval of their breakage practice, the Court agrees with Plaintiffs that the 2015 FCC Order says otherwise.  The 2015 FCC Order – which specifically pertains to inmate calling services ("ICS") – unequivocally bans all ancillary charges not enumerated in the Order.  (FCC Order, Doc. 91-1 ¶¶ 161-63, 173-74.)  The Order states in relevant part:

> After careful consideration of the record, including analysis of the Mandatory Data Collection, we conclude that reform is necessary to address ever-increasing fees that are unchecked by competitive forces and unrelated to costs.  ICS providers, which typically have exclusive contracts to serve a facility, have the incentive and ability to continue

to extract unjust and unreasonable ancillary service charges.  As a result, we conclude it is necessary to reform the ancillary service charge structure imposed on consumers by ICS providers, as shown in Table Four below.  *All other ancillary service charges not specifically included in Table Four are prohibited. . . .*

**Table Four**

| Permitted Ancillary Service Charges and Taxes | Monetary Cap Per Use /Instruction |
|---|---|
| Applicable taxes and regulatory fees | Provider shall pass these charges through to consumers directly with no markup |
| Automated payment fees | $3.00 |
| Fees for single-call and related services, e.g., direct bill to mobile phone without setting up an account | Provider shall directly pass through third-party financial transaction fees with no markup, plus adopted, per-minute rate |
| Live agent fee, i.e., phone payment or account set up | $5.95 |
| Paper bill/statement fees (no charge permitted for electronic bills/statements) | $2.00 |
| Prepaid account funding minimums and maximums | Prohibit prepaid account funding minimums and prohibit prepaid account funding maximums under $50 |
| Third-party financial transaction fees, e.g., MoneyGram, Western Union, credit card processing fees and transfers from third-party commissary accounts | Provider shall pass this charge through to end user directly, with no markup |

(*Id*. ¶¶ 161, 163) (emphasis added.)  In effect, this is a "prohibition by omission" ruling; the Order prohibits ancillary charges not otherwise listed in Table Four. The Order further explains that, by limiting ancillary charges in this way, the FCC seeks to "resolve other problems presented in the record" – at which point the Order cites to a comment that raises the very practice that Plaintiffs challenge here. (*Id*. ¶ 174.)  The comment states: "In some cases, telecoms are actually taking

prepaid moneys from prisoner accounts if for whatever reason the account is 'inactive.'" (*Id.* ¶ 174 n. 627.)  Based on this language, the Court finds that the 2015 FCC Order addresses the sort of inactivity policy at issue in this case and prohibits it.[9]

GTL also argues that, because the 2015 FCC Order has been vacated and remanded by the D.C. Circuit, it should have no influence on the Court.  *See Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017).  But the D.C. Circuit only vacated and remanded certain portions of the 2015 FCC Order.  In relevant part, the D.C. Circuit examined whether the Order's imposition of caps on ancillary fees for inmate calling services was justified.  The D.C. Circuit held that the FCC has plenary power to regulate *interstate* rates and practices connected with interstate calls, whereas the FCC does not have such authority over *intrastate* rates and practices.  The D.C. Circuit also found that it could not discern from the record "whether ancillary fees can be segregated between interstate and intrastate calls." *Id.* at 415.  Thus, the D.C. Circuit remanded to the FCC "to determine whether it can segregate proposed caps on interstate calls (which are permissible) and the proposed caps on intrastate calls (which are impermissible)." *Id.* at 402.  In other words, the D.C. Circuit did not disturb the Order's determination that ancillary

---

[9]     Though GTL highlights the distinction between prisoner accounts and the accounts of their family members (at issue here), the condemned conduct is essentially the same.  This distinction is not a meaningful one in light of the 2015 FCC Order's broad language.

     GTL also argues that Plaintiffs' citation to a passage in the FCC's Further Notice of Proposed Rulemaking – which specifically raised GTL's inactivity or breakage practices – does not constitute a final rule prohibiting such practices.  This may be so.  However, the 2015 FCC Order *does* specifically identify the inactivity policy and characterize it as a "problem" that the Order is meant to resolve.  (FCC Order, Doc. 91-1 ¶ 174 n. 627.)

charges not enumerated in the Order – such as taking prepaid money in inactive accounts – are prohibited.

As noted above, the Court finds that Plaintiffs' Second Amended Complaint does not adequately allege that the challenged practice (with respect to the particular Plaintiffs here) involves interstate communication.    However, if Plaintiffs properly amend their FCA claim and make a sufficient showing that some calls were (or would have been) interstate calls, the conduct at issue in this litigation would be covered – and prohibited – by the 2015 FCC order.  A referral to the FCC based on primary jurisdiction would be inappropriate under these circumstances.  *Fontan-de-Maldonado v. Lineas Aereas Constarricenses, S.A.*, 936 F.2d 630, 631 (1st Cir. 1991) ("Of course, if the agency has already announced its views, there is no need to apply the [primary jurisdiction] doctrine."); *see also In re Global Tel\*Link Corp. ICS Litigation,* No. 5:14-CV-5275-TLB (W.D. Ark. Jan. 29, 2015) (Doc. 29) (finding that a referral to the FCC was unnecessary where the FCC had already made available a good deal of expertise).

Another reason not to send the case to the FCC – should the Court conclude that the challenged conduct involves interstate communication — is that it would result in unnecessary delay.  As Plaintiffs argue, courts may weigh the likelihood of delay and the timeliness of the assertion of the primary jurisdiction doctrine in deciding whether to invoke the doctrine.  *Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412, 419 (5th Cir. 1976) (stating that "courts should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not

always, results in added expense and delay to the litigants"); *Morsey v. Chevron USA, Inc.*, 779 F. Supp. 150, 153 (D. Kan. 1991) (declining to refer the case to the FCC where defendant waited nearly two years from the time it removed the case to assert primary jurisdiction); *In re Global Tel\*Link Corp. ICS Litigation,* No. 5:14-CV-5275-TLB (W.D. Ark. Jan. 29, 2015) (Doc. 29) (declining to refer the case to the FCC because a referral risked delaying plaintiffs' day in court for many years longer).  Here, the fact that GTL waited more than two years to seek referral to the FCC (after a motion to dismiss, an arbitration, discovery exchange, and depositions) weighs against referral to the FCC.[10]

For the foregoing reasons, the Court likely would not find it appropriate to refer this case to the FCC under the primary jurisdiction doctrine.

### b.    Requirement of a Prior Determination by the FCC

The Court now turns to GTL's final argument affecting Plaintiffs' potential FCA claim.  GTL contends that Plaintiffs' claim further fails because private litigants are not authorized to sue for purported FCA violations without the FCC first determining that the practice in question is unreasonable.  As with its argument regarding the primary jurisdiction doctrine, GTL asserts that the FCC has never found GTL's inactivity policy to be unjust or unreasonable and so Plaintiffs cannot challenge it in district court.

---

[10] Moreover, the potential for delay upon referral to the FCC is a real one, as the proceedings that led to the issuance of the 2015 FCC Order lasted an incredible twelve years.  (FCC Order, Doc. 91-1 ¶ 1.)

Plaintiffs contend that their claims do not require a prior determination by the FCC.  Even so, they contend that there has already been such a determination in the 2015 FCC Order.  (Pl. Resp., Doc. 91 at 24.)

The plain text of 47 U.S.C. § 207 reads as follows:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may **either** make complaint to the Commission as hereinafter provided for, **or** may bring suit for the recovery of the damages for which such a common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person **shall not have the right to pursue both** such remedies.

(emphasis added).  The statute expressly allows a plaintiff alternative options in how she seeks relief.  *Mexiport Inc. v. Frontier Commc'ns Servs., Inc.*, 253 F.3d 573, 575 (11th Cir. 2001) ("We . . . find that the language of 47 U.S.C. § 207 is unambiguous.  The statute allows a complainant to file a complaint with the FCC *or* in federal district court but not both.") (emphasis in original)[11]; *Digitel, Inc. v. MCI Worldcom, Inc.*, 239 F.3d 187, 190 (2d Cir. 2001) ("There can be no doubt that § 207 permits an injured party to seek relief either in federal court or before the FCC, but not in both."); *Kimber Baldwin Designs, LLC v. Sily Communications, Inc.* 225 F. Supp. 3d 670 (S.D. Ohio 2016) (finding that

---

[11] The fact pattern in *Mexiport* was slightly different, as the Eleventh Circuit had to determine whether the plaintiff's filing of an informal (as opposed to a formal) complaint with the FCC precluded the plaintiff from filing an action in district court.  The Eleventh Circuit reasoned that the FCA does not distinguish between informal and formal complaints, and therefore the plaintiff's decision to file an informal complaint with the FCC still barred filing in district court. Despite the factual differences with the instant case, the Court finds the *Mexiport* decision to be instructive in its analysis of Section 207.  Notably, the Eleventh Circuit in *Mexiport* never mentioned a "prior determination" requirement before the plaintiff could file in district court; the Eleventh Circuit simply stated that a plaintiff could file a complaint with the FCC or in district court.

Congressional intent to provide a private right of action was clear, as evidenced by the text of the statute allowing one claiming to be damaged to bring suit in district court).

Despite this seemingly clear language, some courts have held that a prior determination by the FCC is necessary to file a Section 207 claim in district court. *See Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 89 (3d Cir. 2016); *N. Cnty. Commc'ns v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1160 (9th Cir. 2010). In particular, the *Havens* court concluded that the "FCC must first determine that a particular type of practice constitutes an 'unjust or unreasonable' practice . . . before a plaintiff may bring a cause of action . . . [based on] that conduct." *Havens*, 820 F.3d at 90.

The Eleventh Circuit has not directly addressed the "prior determination" ruling in *Havens*. If anything, the Eleventh Circuit's *Mexiport* decision seems to point in the other direction. Whether some version of *Havens* or *Mexiport* governs, however, there has already been a prior determination regarding the practice at issue: the 2015 FCC Order. As the Court concluded above, the 2015 FCC Order disallows practices and charges by which prison communications carriers take funds from accounts after a period of inactivity. (FCC Order, Doc. 91-1 ¶¶ 161, 173 n. 627.) That other portions of the Order have been vacated or remanded for further review does not change the FCC's disapproval of this particular practice. Thus, the Court's decision here does not run counter to the decision in *Havens*.

GTL next argues that if the FCC Order did condemn their inactivity policy practice, it should not be applied retroactively to the time before the issuance of the FCC Order on November 5, 2015.

But the Court agrees with Plaintiffs that the FCC Order does apply retroactively, based on the specific situation at hand. *See Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 539-540 (D.C. Cir. 2007) (reversing FCC's decision not to give retroactive application to its interpretation regarding prepaid calling markets, noting the presumption of retroactivity where agency decisions do not substitute new law for old but rather are new applications of existing law, clarifications, and additions); *AT&T v. FCC*, 454 F.3d 329, 333 (D.C. Cir 2006) (stating that where a regulated entity cannot point to a previously settled rule, retroactivity is the norm; finding that an order on fees applicable to prepaid calling cards had retroactive effect). As *AT&T v. FCC* further discusses, where a party affected has known of the likelihood of the new policy for many years, "it assumed the risk of an adverse Commission decision." *AT&T v. FCC*, 454 F.3d at 334. Here, the litigation that culminated in the 2015 FCC Order, banning the breakage practice, lasted for 12 years and involved ICS issues closely related to this case.[12] (*See* FCC Order, Doc. 91-1 ¶ 1). GTL could certainly be tasked, then, with assuming the risk of an adverse decision.

---

[12] The case before the FCC began when an individual petitioned the agency for relief from "exorbitant phone rates charged by inmate calling service (ICS) providers, so that she might afford telephone contact with her incarcerated grandson." (FCC Order, Doc. 91-1 ¶ 1.)

Finally, the Court notes that regardless of the retroactivity of the order, Plaintiffs allege that some of them were subject to GTL's inactivity policy after the issuance of the 2015 FCC Order. (Pl. Mot. for Sur-Reply, Doc. 102 at 3, 10.)  In addition, Plaintiffs argue that GTL continues to engage in this practice today.  (*Id.*) In light of Plaintiffs' representations and the reasons stated above, the Court would likely find that Defendant's prior determination argument does not dispose of Plaintiffs' potential FCA claim.

## B. Plaintiffs' State-Law Claims (Counts I and II)

### 1. The Filed-Rate Doctrine

The Court next considers GTL's argument that all of Plaintiffs' claims are barred by the filed-rate doctrine.[13]   Under the FCA, every common carrier is required to file with the FCC "schedules" (i.e., tariffs) showing all charges and showing the classification, practices, and regulations affecting such charges. *American Tel. & Tel. Co. v. Central Office Telephone, Inc.*, 524 U.S. 214 (1998); 47 U.S.C. § 203(a).  The filed-rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal [or state] regulatory authority."  *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981).[14] "[T]he rates a carrier charges its customers, once filed with and approved by the FCC, become 'the law' and exclusively govern the rights and liabilities of the carrier

---

[13] GTL's argument regarding the filed-rate doctrine is relevant to all three of Plaintiffs' claims. Thus, the discussion herein – pertaining to the filed-rate doctrine — also applies to Plaintiffs' FCA claim should the Court find, upon amendment, that it survives.

[14] Additionally, it is unlawful for a carrier to "employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule."  47 U.S.C. § 203(c).

to the customer." *Hill v. Bellsouth Telecommunications*, *Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004).

The provisions that ground this filed-rate doctrine are modeled after similar provisions of the Interstate Commerce Act ("ICA") and "share its goal of preventing unreasonable and discriminatory charges." *Central Office*, 524 U.S. at 222. Accordingly, this doctrine is based on two core principles: nondiscrimination and nonjusticiability.  *Hill*, 364 F.3d at 1316.  The nondiscrimination principle stands for the proposition that similarly situated customers should pay the same rates for the same services. *Central Office*, 524 U.S. 214 at 223.   The nonjusticiability principle seeks to ensure that regulators, rather than the courts, employ their expertise to determine the reasonableness of proposed rates.  *Ark. La. Gas*, 453 U.S. at 577.

It is not disputed that GTL has tariffs on file with the FCC and Georgia's Public Service Commission ("PSC").   The relevant portion of GTL's filed tariffs states:

> The Customer may close the Advance Pay Account at any time. At the written request of the Customer (usually upon release of an inmate from an institution), any remaining balance in the Account will be refunded to the Customer after deducting any call charges, applicable taxes and transaction fees incurred during the billing cycle. **Advance Pay Accounts will be automatically dissolved following three months of zero activity (i.e., no calls placed, no account replenishment, no customer service inquiries).**

(Def. Mot. to Dismiss, Doc. 79, Ex. 1) (emphasis added.)  Essentially, GTL argues that because its inactivity policy practice was disclosed with the proper agencies,

the filed-rate doctrine bars Plaintiffs' claims.  (Def. Mot. to Dismiss, Doc. 79 at 11-12.)

Plaintiffs provide three reasons why their claims are not barred by the filed-rate doctrine: (1) Plaintiffs are not challenging GTL's rates or the services provided for those rates, but rather they are challenging a practice by GTL; (2) GTL does not actually fully disclose the "inactivity policy" in its tariffs; and (3) the FCC and Georgia's PSC have prohibited GTL's practice.

The Court concludes that Plaintiffs' claims are not barred by the filed-rate doctrine.  First, the Court is persuaded that the practice Plaintiffs challenge is neither (1) a filed rate nor (2) a service or privilege provided by GTL in exchange for payment of a rate.  What Plaintiffs challenge is "GTL's practice of taking Plaintiffs' money at a point when [] GTL is *not* providing services to Plaintiffs." (Pl. Resp., Doc. 91 at 11.)  The filed-rate doctrine does not extend to cover a defendant's conduct that is not related to a particular rate or service associated with a rate. *See Brown v. MCI WorldCom Network Services, Inc.*, 277 F.3d 1166 (9th Cir. 2002) (finding that filed-rate doctrine did not apply where plaintiff alleged that defendant created extraneous accounts and charged him unauthorized $10 monthly fee for no services rendered, as opposed to challenging the monthly fee itself as unreasonable or invalid).

GTL argues that the fact that Plaintiffs "challenge the *inactivity policy* or *classification*, rather than the rates themselves, is beside the point." (Def. Mot. to Dismiss, Doc. 79 at 13) (emphasis in original.)  The Court finds otherwise.  It is true

that "rates do not exist in isolation," and that the Supreme Court has articulated that "[a]ny claim for excessive rates can be couched as a claim for inadequate services and vice versa. . . . An unreasonable 'discrimination in charges' [] can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." *Central Office*, 524 U.S. at 233. But unlike in *Central Office* or other cases GTL relies upon, Plaintiffs here do not allege that a service was inadequate or that they were excessively charged. Plaintiffs allege that they received no service at all for the funds taken.

The Court's finding is further supported by the principles of nondiscrimination and nonjusticiability underlying the filed-rate doctrine. With respect to nondiscrimination, this is not a situation where GTL is seeking to apply the same rate for the same services provided. Rather, when Plaintiffs' accounts were closed, the amount of funds withdrawn by GTL was arbitrarily dependent upon how much money was in the accounts at the time. GTL did not withdraw any specified "rate" in exchange for a service. *In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1192 (10th Cir. 2010) (emphasizing congressional intent under the FCA that customers receive uniform rates, terms, and conditions of service). With respect to nonjusticiability, it is not at issue here. Plaintiffs are not asking the Court to weigh in on the appropriate rates for services rendered. *Qwest Commc'ns Co. v. Aventure Commc'ns Tech.*, 86 F. Supp. 3d 933, 998 (S.D. Iowa 2015) (finding that filed-rate doctrine did not apply where plaintiff did not ask the court to determine a reasonable value for services rendered).

Turning to Plaintiffs' second argument, even if the inactivity policy which Plaintiffs challenge were to be deemed a "rate" or associated service under the filed-rate doctrine, their claims still would not be barred.  The actual practice at issue is not properly disclosed in the filed tariffs.  As represented above, GTL's filed tariff states:

> The Customer may close the Advance Pay Account at any time. At the written request of the Customer (usually upon release of an inmate from an institutuion), any remaining balance in the Account will be refunded to the Customer after deducting any call charges, applicable taxes and transaction fees incurred during the billing cycle. **Advance Pay Accounts will be automatically dissolved following three months of zero activity (i.e., no calls placed, no account replenishment, no customer service inquiries).**

(Def. Mot. to Dismiss, Doc. 79, Ex. 1) (emphasis added.)   Contrary to GTL's assertion that the filed tariff "could not be clearer" about what happens to any remaining money in the accounts, the Court concludes that the text of the tariff does not indicate that a customer's funds will be forfeited and converted to GTL revenue.  As Plaintiffs argue, the money could be returned to the customer, could be sent to a third party, could be subject to state law dealing with unclaimed property or, as was done here, could be converted to revenue.  Without a more complete disclosure, customers cannot be charged with being on notice of the breakage practice, the regulatory agencies cannot be said to have approved of the practice, and GTL cannot contend that the policy Plaintiffs challenge is a tariffed practice.  *Qwest*, 86 F. Supp. 3d at 998 (finding that filed-rate doctrine did not apply where plaintiff (long distance phone company) alleged that defendants (local

exchange carriers) wrongfully obtained funds for services not tariffed); *In re Blue Cross Blue Shield Antitrust Litig.*, 238 F. Supp. 3d 1313, 1332 (N.D. Ala. 2017) (finding that filed-rate doctrine did not bar claims of particular plaintiffs since "no rates were filed with respect to those groups").

GTL's reliance on *Hill v. Bellsouth Telecommunications, Inc.* is also not persuasive.  In *Hill*, the plaintiff challenged the particular rate she was charged by Bellsouth. *Hill*, 364 F.3d at 1312.   Under the FCA, Bellsouth (like other telecommunications providers) was required to contribute a percentage of its revenue to a "Universal Service Fund" ("USF") designed to provide affordable telecommunications services to rural and low-income areas.  *Id.*  To comply with this requirement, Bellsouth imposed a separate itemized charge of $0.53 on each customer's monthly bill listed as the "Federal Universal Service Charge" ("FUSC"). *Id.*  Both Bellsouth's total required contribution to the USF and the $0.53 amount levied on customers was included and explained in the tariffs Bellsouth filed with the FCC.  *Id.* at 1311-1312.  The plaintiff argued that Bellsouth misrepresented the amount it was required to contribute to the USF and overcharged customers under the FUSC charge.  *Id.* at 1315.  The court in *Hill* concluded that the plaintiff's claims were barred by the filed-rate doctrine because the USF and the FUSC charges were in fact filed with the regulatory agency, and allowing the plaintiff to recover would retroactively reduce her rate (as compared to other customers), violating the nondiscrimination principle.  *Id.* at 1316.

Here, Plaintiffs challenge a practice of taking consumer funds (for no service) that is not clearly disclosed in the listed tariffs. Plaintiffs further argue that they do not seek a reduction of rates, but the return of funds improperly taken. Simply put, *Hill* is too factually distinct to be persuasive on the issue of the filed-rate doctrine.

Furthermore, as a general matter, the Eleventh Circuit has described the limited scope of the filed-rate doctrine. The Eleventh Circuit notes that this doctrine should "preclude damage claims only where there are validly filed rates." *Fla. Mun. Power Agency v. Fla Power & Light Co*., 64 F.3d 614, 616 (11th Cir. 1995) (citing *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 216 (1966)).

In *Florida Municipal*, the plaintiff Florida Municipal Power Network alleged that the defendant Florida Power & Light refused to sell it network transmission service, thereby breaching the contract and violating antitrust law. *Fla. Mun*., 64 F.3d at 615.[15] In turn, the defendant argued that the plaintiff's claims were barred by the filed-rate doctrine, and the district court agreed. *Id*. The district court found that the defendant's filed rate for "point-to-point service" applied to bar the plaintiff's claims regarding "network transmission" service. The Eleventh Circuit, however, held that there was a genuine issue of material fact as to whether point-to-point service was distinct from network transmission service. If the "two services are distinct and there is no filed network rate," the Eleventh Circuit

---

[15] While *Florida Municipal* did not involve the FCA, the filed-rate doctrine "is applicable any time a regulated company has a rate for a service on file with the applicable regulatory agency." *Fla. Mun*., 64 F.3d at 614. The analysis of the doctrine is therefore instructive.

reasoned, "then it is clear the doctrine would not confer immunity." *Id.* at 616.  In reaching this conclusion, the Eleventh Circuit emphasized that "[t]he characterization of the plaintiff's claim is therefore critical to whether the filed rate doctrine will apply." *Id.*  Furthermore, the Eleventh Circuit noted that a carrier cannot rely on the filed-rate doctrine when the filed tariff lacks an "essential element" and thus the carrier "in effect has no rates on file." *Id.* at 616 (citing *Security Services v. Kmart Corp.*, 511 U.S. 431 (1994) (finding that carrier's filed rate which specified rates to be charged per mile of carriage was "lacking an essential element" when it did not include a list of distances or a map on which a shipper could rely in calculating charges for a given shipment)).  The Eleventh Circuit thus vacated and remanded the district court's grant of summary judgment in favor of the defendant. *Id.* at 617.

Here, the filed-rate doctrine does not bar Plaintiffs' claims as characterized in the Second Amended Complaint.  Plaintiffs do not challenge, for example, the long-distance rates charged for certain calls and explicitly published in GTL's tariffs.  Such a claim would presumably be barred.  Rather, Plaintiffs challenge a practice not fully set forth or explained in the tariffs.  In this way, the tariffs could be considered to lack an essential element.  Like the failure to include a list of distances or a map in *Kmart*, GTL's failure to include that customers' funds would be forfeited and converted to GTL revenue renders the tariff incomplete for the issue at hand. *See* 511 U.S. at 433.

Finally, revisiting the purpose of the filed-rate doctrine is instructive. Courts explain the doctrine as working "to prevent unreasonable and discriminatory charges," where the "filing requirement render[s] rates definite and certain, and [] prevent[s] discrimination and other abuses." *Brown*, 277 F.3d at 1170 (internal quotations omitted). "The Filed Rate Doctrine is not some sort of panacea for any ills [d]efendants may (or may not) have." *In re Blue Cross Blue Shield*, 238 F. Supp. 3d 1313, 1332 (N.D. Ala. 2017). And further, it does not govern the entirety of the relationship between the common carrier and its customers, and it does not affect whatever duties state law might impose on defendants. *Central Office*, 524 U.S. at 230 ("[The filed-rate doctrine] does not serve as a shield against all actions based in state law.") (Rehnquist, J.) (concurring). In light of courts' discussion and application of the doctrine, it becomes apparent that GTL is trying to stretch the filed-rate doctrine beyond its intended purpose. For the reasons discussed above, the Court finds that the filed-rate doctrine does not bar Plaintiffs' claims in this case, at least on the record at this stage of the proceeding.

### 2. The Voluntary Payment Doctrine

The Court next considers GTL's argument that Plaintiffs' contract and unjust enrichment claims are barred by the voluntary payment doctrine. (Def. Mot. to Dismiss, Doc. 79 at 22-23.) The relevant statutory language states:

> Payments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefore or to release person or

> property from detention or to prevent an immediate seize or person
> or property...

O.C.G.A. § 13-1-13.  GTL argues that because Plaintiffs had constructive knowledge

of the inactivity policy (given the filed tariff), and because they don't allege fraud

or deception, Counts I and II fail.

The Court determines that GTL's voluntary payment doctrine argument is

premature.  As an affirmative defense, the voluntary payment doctrine "often

entails a fact-based inquiry and is not suited for resolution at the dismissal stage."

*Cableview Comm'ns of Jacksonville, Inc. v. Time Warner Cable SE LLC*, 2014 WL

1268584 at *20 (M.D. Fla. March 27, 2014).  The doctrine "can justify a complaint's

dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the

complaint shows on its face that the defense applies."  *Twin City Fire Insurance

Co. v. Hartman, Simons & Wood*, LLP, 609 F. App'x 972, 978 (11th Cir. 2015).

Plaintiffs argue that GTL's practice involved a taking of deposits – an

allegedly *involuntary* payment – and that they did not have constructive

knowledge of this practice.  At this stage, a court accepts the facts in a plaintiff's

complaint as true.  *Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993).  As the

resolution of this issue requires a more "fact-based inquiry," GTL may renew this

issue at the summary judgment stage or at trial.  *Cableview,* 2014 WL 1268584 at

*20.

### 3.  Plaintiffs' Unjust Enrichment Claim (Count II)

The Court considers GTL's final argument – that Plaintiffs' unjust enrichment claim fails because they already have an adequate available legal remedy in their contract claim.  Regardless of whether Count II is pled in the alternative, GTL contends that Plaintiffs' claim cannot stand because both parties admit that a valid contract exists. *Goldstein v. Home Depot USA, Inc.*, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009) (holding that a party may plead in the alternative only if one or more of the parties contests the existence of an express contract governing the subject of the dispute).

But Plaintiffs dispute whether GTL has, in fact, admitted to the existence of a contract here.  Plaintiffs further argue that they are permitted to proceed to trial on alternate theories of recovery.

The Court agrees with Plaintiffs.  At this early stage, it is not clear that GTL has admitted to a contract and, if so, with which Plaintiffs.  (*See* GTL's Responses to Plaintiffs' Fourth Set of Interrogatories, Doc. 91-5.)  Moreover, the parties appear to dispute the material terms of the agreement, and the knowledge and expectations of the parties regarding the prepaid accounts is also at odds.  Under these circumstances, as alleged, a factfinder could determine that there was no "meeting of the minds." *Wingate Land & Dev., LLC v. Robert C. Walker, Inc.*, 558 S.E.2d 13, 15-16 (Ga. Ct. App. 2001) (finding that, where a decision maker could conclude that there was no "meeting of the minds," a party should be able to proceed on alternate theories of recovery).

The Court therefore determines that Plaintiffs' unjust enrichment claim may proceed as an alternative to the breach of contract claim. If this case proceeds through discovery, Defendant may once again raise this argument if the evidence shows that a contract did, in fact, exist between individual Plaintiffs and GTL.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Dismiss [Doc. 79]. Additionally, the Court **GRANTS** Plaintiffs' Motion for Leave to File a Sur-Reply [Doc. 102]; **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion to Supplement or Amend [Doc. 105]; and **GRANTS** Plaintiffs' Motion to Lift the Seal [Doc. 106] and **DENIES** Defendant's Motion to File a Response Under Seal [Doc. 110].

**IT IS SO ORDERED** this 7th day of September, 2018.

**Amy Totenberg**
**United States District Judge**