IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BENSON GITHIEYA, *et al.*,     :
     :
     :
    Plaintiffs,     :
     :
v.     :    CIVIL ACTION NO.
     :    1:15-CV-986-AT
GLOBAL TEL*LINK     :
CORPORATION,     :
     :
    Defendant.     :

## OPINION AND ORDER

## I.    Introduction

This case is before the Court on Plaintiffs Benson Githieya, Nellie Lockett, and Darlene Byers's Motion for Sanctions [Doc. 168].[1] Plaintiffs allege that Defendant Global*Tel Link (GTL) withheld key evidence during discovery, presented false testimony and false statements to the Court, and violated a Court Order in an attempt to deceive Plaintiffs and the Court. Plaintiffs contend that GTL conducted discovery in bad faith and perpetrated a fraud on the Court. Defendant denies it presented false testimony and evidence and, alternatively, contends if any information was incorrect it did not intentionally make misrepresentations to the Plaintiffs or the Court.

---

[1] On March 12, 2019 the Court stayed Plaintiffs' Motion for Class Certification (Doc. 122), Defendant's Motion for Oral Argument on Plaintiff's Motion for Class Certification (Doc. 158), and Defendant's Motion for Leave to File Supplemental Briefing in Opposition to Plaintiffs' Motion for Class Certification (Doc. 182).  The Court issues its order on the pending class certification motion simultaneous with this issuance of this Order.

Plaintiffs Benson Githieya, Nellie Lockett, and Darlene Byers bring this action on behalf of a putative class of customers of GTL. Plaintiffs are friends and family members of inmates who set up prepaid (AdvancePay) accounts with GTL to facilitate telephone communication with their incarcerated loved ones. Plaintiffs specifically challenge GTL's "inactivity policy" (which is described below) and bring state-law claims of breach of contract and unjust enrichment as well as claims arising out of alleged violations of the Federal Communications Act (FCA), 47 U.S.C. § 201 *et seq*.

In 2011, Darlene Byers opened a pre-paid AdvancePay account with GTL so that she could talk to her son who was incarcerated. Ms. Byers called GTL's 1-800 number, listened to the audio recording and terms, and deposited money into her newly-opened GTL account. Months later, GTL classified Ms. Byers's account as "inactive" because the account had no phone call or other activity for ninety days. When GTL classified Ms. Byers's account as "inactive", GTL reduced her remaining account balance of $1.42 to $0.00. Ms. Byers continued to deposit money into her account. Over several years, GTL classified her account as inactive four times. In total, Ms. Byers lost $10.47 as a result of GTL deeming her account inactive. (Doc. 178 at ¶¶ 62-69.) Byers is not alone. The other named Plaintiffs, Benson Githieya and Nellie Lockett, also allege that GTL took their account balances after a period of inactivity. Mr. Githieya opened his AdvancePay account in 2014 and Ms. Lockett opened her AdvancePay account in 2011.  GTL's records, introduced at the sanctions hearing, similarly reveal that from 2009 to mid-2017, GTL took or

appropriated over $110,000,000 from millions of customers' GTL AdvancePay accounts pursuant to GTL's inactivity policy. (Doc. 123-26 at 3.)

GTL's inactivity policy and associated financial practices – and how GTL communicated this policy to its customers – fall at the heart of this case. Under this policy, when an account has had no activity for ninety days, GTL closes the account. No activity means that the customer has not received any calls on the account, no other charges were levied, the customer has not made any payments, and there have not been any adjustments. When an account is subject to GTL's inactivity policy, GTL appropriates all of the remaining money in the customer's account, i.e. it is a use it or lose it policy.[2]

Ms. Byers, Mr. Githieya, and Ms. Lockett all called GTL's automated line to set up their accounts. Plaintiffs then heard an automated voice "script" (an interactive voice-response system) to guide their establishment of a prepaid AdvancePay account. Plaintiffs spent a significant amount of time in discovery seeking this script. According to Plaintiffs, the script formed the foundation for the contract terms they entered into with GTL. Plaintiffs wanted to know exactly what they agreed to when they set up their accounts. Significantly, did GTL's automated script inform Plaintiffs that GTL had a use it or lose it policy and did Plaintiffs affirmatively agree to that policy provision?

---

[2] GTL's closure of the count and appropriation of the customer's account balance funds automatically is triggered and effectuated by a computer program's identification of the end of the 90th day of account inactivity (or for some accounts, the 180th day of account inactivity).

During the course of the litigation, GTL repeatedly and consistently represented to Plaintiffs and the Court that the script stated that account "balances that remain unused may expire after 90 days," and that Plaintiffs thus were fully advised of the terms of the contract they were entering. It turns out that this representation is false. In January of 2014 — before this litigation commenced — GTL removed this statement (known as the "may expire" statement) from its automated line. However, GTL did not share this information with Plaintiffs at any point in discovery. Plaintiffs' independent investigation during the briefing of the class certification motion (post discovery) uncovered that GTL's phone script no longer included this statement.

GTL did more than simply hide that it had removed the statement in early 2014 from its automated phone script — it also produced documents and provided deposition testimony that all putative class members actually heard the statement. According to Defendants, Plaintiffs agreed to have their accounts (and funds) expire after 90 days of inactivity and Plaintiffs' assent to this statement nullified their claims, as will be discussed later herein.

Four years after Plaintiffs filed their lawsuit, it turned out that critical discovery testimony and responses – and in turn, a centerpiece of GTL's defense in this litigation — were based on a misrepresentation that boils down to a lie. GTL insisted, over and over again in different variants, that this lie was the truth. GTL's litigation strategy resulted in significant delays and detours in reaching the merits of this case, extensive briefing, and a two-day evidentiary hearing on Plaintiffs'

instant Motion for Sanctions. GTL's conduct, in short, effectively caused the case to go off the rails. Defendant's conduct resulted in significant litigation harm and forced Plaintiffs' counsel to engage in major legal work that would have been obviated but for GTL's course of gamesmanship.

Plaintiffs' motion seek sanctions that include (1) striking of the Defendant's Answer and entry of default, or (2) alternatively, a sanction that would find as established certain terms of GTL's contract with Plaintiffs and that would preclude GTL from relying on any purported evidence that Plaintiffs had agreed that GTL could seize their account's funds after 90 days of no activity. Plaintiffs additionally request that the Court strike the Defendants' class certification response brief based upon the Defendant's alleged course of misleading conduct and false assertions in that brief. Finally, the Plaintiffs' seek fees and costs based on Defendant's alleged bad faith misconduct in this litigation that precipitated significantly expanded legal work and proceedings.

## II.    Legal Standard

A court may "impose sanctions for litigation misconduct under its inherent power." *Eagle Hospital Physicians v. SRG Consulting, Inc.,* 561 F.3d 1298, 1306 (11th Cir. 2009). This power "derives from the court's need to manage its own affairs so as to achieve the orderly . . . disposition" of a case, but must be "exercised with restraint and discretion." *Id.* (internal punctuation and citations omitted). "The key to unlocking a court's inherent power is [also] a finding of bad faith." *Id.* (quotation marks and citation omitted). "A finding of bad faith is warranted where

an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). Two common fact patterns reappear in cases involving findings of bad faith: willful misconduct that corrupts the adversary process or repeated failures to obey the court's discovery orders.

The Eleventh Circuit has held that "the inherent-powers standard is a subjective bad-faith standard." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (2017) (citing *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) and *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)). Under this standard, "a court has [the] inherent power to . . . sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Marx*, 568 U.S. at 382 (citing *Chambers*, 501 U.S. at 45–46). "The inherent power must be exercised with restraint and discretion. This power is not a remedy for protracted litigation; it is for rectifying disobedience . . . ." *Purchasing Power*, 851 F.3d at 1225 (citing *Chambers*, 501 U.S. at 45–46). "[I]n the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Id.* (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980). The Eleventh Circuit is clear that "[t]his is not the same as simple recklessness, which can be a starting point but requires something more to constitute bad faith."

*Purchasing Power*, 851 F.3d at 1225. Thus, "[r]ecklessness alone does not satisfy the inherent powers standard; there must be more." *Id.* "Bad faith exists when the court finds that a fraud has been practiced upon it, or 'that the very temple of justice has been defiled,' or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (citing *Chambers*, 501 U.S. at 46). "In assessing whether an award is proper under the bad faith standard, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.'" *Id.* (citing *Rothenberg v. Security Management Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir.1984)).

For example, in *In re Sunshine Jr. Stores, Inc.*, the Eleventh Circuit upheld a bankruptcy court's use of its inherent power to enter a default against Bank of New York over objection that it was not properly notified of consequences of its actions. 456 F.3d 1291, 1304 (11th Cir. 2006). Bank of New York had failed to comply with multiple court orders over the span of eighteen months in an attempt to block discovery into whether or not it complied with its fiduciary obligations to provide an accounting of debtor's funds and pay interest on those funds. The Eleventh Circuit affirmed the district court's finding of bad faith because the Bank's "noncompliance delayed the resolution of the Debtor's bankruptcy case, interfered with the bankruptcy court's ability to manage its case load, and, most obviously, hampered the enforcement of the court's orders." *Id.* at 1305. The Court

explained that the Bank's "conduct forced the Debtor repeatedly to appear before the court, seek relief from the court, and otherwise litigate matters that should have been resolved far more quickly." *Id.*

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. *Id.* at 44–45; *see also Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993) (court's inherent authority "includes the authority to impose reasonable and appropriate sanctions"). The Eleventh Circuit has instructed that "[t]he severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1305 (11th Cir. 2006).

Plaintiffs moved this Court for sanctions under this Court's inherent power and under Fed. R. Civ. P. 37. GTL argues that Plaintiffs only moved for sanctions under the Court's inherent power because Plaintiffs did not cite Rule 37 in their Motion for Sanctions. However, Plaintiffs' Motion is explicitly based on their allegations that GTL intentionally violated this Court's Discovery Order. (*See* Pls.' Mot. for Sanctions, Doc. 168 at 20–22.) Plaintiffs also cited cases granting sanctions under Rule 37 in support of their motion. (*See* Pls.' Mot. for Sanctions, Doc. 168 at 24, 26) (citing *Bates v. Michelin N. Am., Inc.*, No. 1:09-CV-3280-AT, 2012 WL 453233 (N.D. Ga. Jan. 13, 2012); *Michaud v. U.S. Steakhouse Bar & Grill,*

*Inc.*, No. 6:04-cv-1371-Orl-UAM, 2007 WL 2155570 (M.D. Fla. July 25, 2007); *Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379 (5th Cir. 1976).) As this Court finds that GTL acted in bad faith and an award of sanctions pursuant to this Court's inherent power is appropriate, it need not parse whether or not Plaintiffs properly moved for Sanctions under Rule 37.

### III. Factual Background

#### a. *Plaintiffs Allege In Their Complaint That They Did Not Agree to GTL Imposing Its Inactivity Policy And Taking Funds From Their Accounts After Ninety Days of "Inactivity".*

Plaintiffs bring this case as a proposed class action based on their phone calling service accounts with GTL. The Plaintiffs – Benson Githieya, Darlene Byers, and Nellie Lockett – are individuals who opened "AdvancePay" accounts with GTL between 2009 and 2014 to facilitate communication with their incarcerated family members and friends. (Third Am. Compl., Doc. 178 ¶¶ 1–16.) During the time Plaintiffs maintained their AdvancePay accounts, GTL was the exclusive provider of inmate calling services for thousands of correctional facilities in the country. (*Id.* ¶ 83.)

**GTL's AdvancePay Accounts**

AdvancePay accounts are pre-funded — the customer deposits money into her account before receiving any phone calls. AdvancePay accounts are GTL's largest single revenue stream. (Baker Dep., Doc. 88 at 16:14–17; 27:3–4; 29:17–20.) Plaintiffs allege that they suffered losses when GTL applied its "inactivity policy" to their AdvancePay accounts. (Third Am. Compl., Doc. 178 ¶¶ 1–16.) GTL's

AdvancePay account system allows a customer to deposit funds into a prepaid account for the purpose of receiving calls from inmates at correctional facilities that contract with GTL. (*Id.* ¶ 36.) GTL then holds the funds in the account in order to pay for calls that a customer receives from an inmate. (Baker Dep., Doc. 88 at 129:6–19) ("AdvancePay customers make deposits, not payments.") Thus, when an incarcerated individual calls a customer, funds are deducted from the prepaid account. (*Id.*) Each Plaintiff deposited money into an AdvancePay account by entering his or her credit card information over the phone into the interactive voice-response (IVR) system. (Third Am. Compl., Doc. 178 ¶ 34.) The process of establishing an AdvancePay account through the IVR system is entirely automated and is basically identical nationwide. (Baker Dep., Doc. 88 at 189:1–190:11.) Plaintiffs allege that the IVR system's automated voice "may have referred to 'terms of use,' but did not state the 'terms of use.'" (Third Am. Compl., Doc. 178 ¶ 40.) Plaintiffs further allege that the automated system did not require Plaintiffs to affirmatively accept any terms of use prior to establishing an account, either vocally or by pressing a button. (*Id.* ¶¶ 41–42.)

**GTL's "Inactivity Policy"**

Simply stated, if a GTL customer has not had any activity in her account in ninety days, GTL takes whatever money is left in the account. Less simply stated, if a GTL AdvancePay account does not see any activity for a period of 90 days, GTL automatically classifies the account as "inactive," reduces any outstanding balance

to $0.00, and converts these unused funds to revenue for GTL.[3]  GTL refers to this practice as "breakage." (Baker Dep., Doc. 88 at 79:21–80:1.)

Plaintiffs explain how GTL implements its inactivity policy in their Motion for Class Certification. (*See* Mot. for Class Cert., Doc. 123-1 at 10–12.) Essentially, GTL has a software application, called the "Breakage Calculator," which GTL uses to detect inactive accounts and convert the remaining balances to revenue.[4] Every night the Breakage Calculator scans all active AdvancePay accounts, searching for those that have a positive balance and that have been inactive. (Philips Dep., Doc. 87 at 94:20–95:24, 69:8–10; 97:25–98:5.) Once the Breakage Calculator determines the account is eligible for breakage, GTL's system then takes two steps. First, the system tags the account as "inactive," which prevents the accountholder from receiving any further calls. Second, GTL's system "reduces the balance [remaining in the account] to zero" and converts the "balance of the account [so that it] is reflected as revenue" in GTL's books. (Baker Dep., Doc. 88 at 47:18–22; 49:4–15, 50:1–8, 165:18–166:7; *see also* Philips Dep., Doc. 87 at 195:7–24; 196:22–197:2.)

Plaintiffs claim that GTL never informed them that it would reduce their account balances to $0.00 after a period of inactivity when they first established AdvancePay accounts. (Third Am. Compl., Doc. 178 ¶¶ 79, 81.) Further, Plaintiffs

---

[3] Plaintiffs allege that GTL's inactivity policy is ongoing. (*Id.* Third Am. Compl., Doc. 178 ¶¶ 45, 78, 125.)

[4] There are a few exceptions to this practice. For example, some facilities specifically exempt themselves from this policy. (*See* Philips Dep., Doc. 87 at 90:19–91:4.)

allege that the published webpage "terms of use" contained no notice that a customer's funds would be reduced to $0.00 after an inactivity period. (*Id.* ¶ 82.) Thus, Plaintiffs allege that this "inactivity policy" constituted a taking of their funds that they were never informed of and never agreed to. (*Id.* ¶¶ 80–81.)

**Plaintiffs' Claims**

Plaintiffs bring claims for breach of contract (Count I), unjust enrichment (Count II), and violations of the Federal Communications Act (FCA), 47 U.S.C. § 201, et seq. (Count III). In their Count I contract claim, Plaintiffs allege that GTL entered into contracts with them and that these contracts were formed as a result of Plaintiffs' use of GTL's automated IVR system when establishing their AdvancePay accounts. (*Id.* ¶¶ 101–102.) Specifically, Plaintiffs assert that GTL expressly or implicitly agrees to hold a customer's funds until they are needed to pay for a call with an inmate. (*Id.* ¶ 105.) Each Plaintiff opened and funded a prepaid account in exchange for such a service. (*Id.* ¶ 106.) Plaintiffs contend that these alleged contracts, between Plaintiffs and GTL, included no express or implicit terms that permit GTL to take a customer's prepaid funds and treat such funds as revenue (a practice Defendant refers to as "breakage") after a 90– or 180– day period of inactivity. (*Id.* ¶ 107.) Plaintiffs further allege that, even if there was a "term" allowing GTL to take prepaid funds, it would be unenforceable as a matter of law as an unlawful penalty. (*Id.* ¶ 108.) Consequently, Plaintiffs allege they suffered damages from GTL's breach of these express or implied contracts. (*Id.* ¶¶ 109–110.)

In the alternative to their contract claim, Plaintiffs bring a claim of unjust enrichment. (*Id.* ¶ 112.) Plaintiffs allege that they conferred a substantial benefit on GTL in the form of prepaid amounts deposited with, and later taken by, GTL. (*Id.* ¶ 113.) Plaintiffs further allege that GTL "deliberately sought to prevent Plaintiffs and the Class members from discovering the policy and practice." (*Id*. ¶ 117.) Plaintiffs seek disgorgement and restitution of amounts wrongfully obtained pursuant to this "unjust policy and practice." (*Id.* ¶ 119.)

Finally, Plaintiff Githieya and the putative class members assert a claim for violations of the FCA. Plaintiff Githieya alleges that GTL (a common carrier engaged in interstate commerce) violated the FCA's requirement that all "charges, practices, classifications, and regulations" be just and reasonable. (*Id.* ¶¶ 20, 121, 122, 124) (citing 47 U.S.C. § 201(b).) Any such "charge, practice, classification or regulation" that is unjust or unreasonable is declared unlawful. (*Id.* ¶ 124.) GTL's "inactivity policy," according to Plaintiffs, is unjust and unreasonable — and thus unlawful. (*Id.* ¶ 125.) Noting that the FCA allows an individual to either make a complaint to the Federal Communications Commission (FCC) or bring suit in district court, Plaintiffs assert that because they have not made a complaint to the FCC, they have standing to bring an FCA claim in district court. (*Id.* ¶¶ 144–46) (citing 47 U.S.C. § 207.)

Plaintiffs ask the Court to permanently enjoin GTL from continuing its "inactivity policy" and taking funds from customer accounts. Plaintiffs seek

damages for the amounts removed from their accounts as well as reasonable attorney's fees and further relief deemed necessary.

> b. *Plaintiffs Spent A Significant Amount Of Time And Resources In Discovery Attempting To Learn What Words Callers Heard When They Called GTL's Automated Line.*

Plaintiffs spent a significant amount of time and effort in discovery seeking the content of GTL's call script because they wanted to learn what words customers heard when they called GTL's automated line. In Plaintiffs' First Request to Produce Documents, Plaintiffs requested "[c]opies of all iterations of your interactive voice response telephone system recordings;" "[a]ll documents showing or reflecting the date your IVR telephone system recordings were used and in effect;" "[a]ll documents related to any changes made to your IVR telephone system records;" and "[d]ocuments related to the reason(s) GTL made any change to its IVR telephone system recordings." (Pls.' First Req. to Prod. Docs., Doc. 168-1 at 9–10, ¶¶ 26–29) (served on May 26, 2017.) Then, in Interrogatory Number 20 of Plaintiffs' Third Set of Interrogatories, Plaintiffs asked Defendant to "identify each date on which GTL made any change, modification, alteration, or amendment of any kind to . . . call scripts for any IVR system relating in any way to Advance Pay Accounts or other prepaid accounts." (Def.'s Resp. to Pls.' Third Interrog., Doc. 168-3 at 13.)

In response to the Plaintiffs' IVR-related discovery requests, GTL produced two identical documents, titled "2010 Master Prompt List," which purportedly included the words customers heard when they called GTL's automated line, and

identified John Baker as GTL's rule 30(b)(6) corporate representative who had the most knowledge of the IVR script.

> ### i. GTL Produced the 2010 Master Prompt List, which Contained the "May Expire" Statement.

The first document GTL produced in this case was the 2010 Master Prompt List. (GTL_Githieya_0000001). A prompt list is a call script that purportedly includes a comprehensive set of the prompts that callers to the IVR heard depending on which buttons they pressed. The 2010 Master Prompt list contained the statement: "Advance Pay balances that remain unused may expire after 90 days." (*See* Doc. 123-21 at 2) (GTL_Githieya_0000001). The Parties refer to this statement as the "may expire" statement.

GTL identified the 2010 Master Prompt List as responsive to Plaintiffs' request for:

- "Copies of all iterations of your interactive voice response (IVR) telephone system recordings." (August 8, 2017 Letter from GTL's Counsel to Plaintiffs' Counsel Supplementing GTL's Resp. to Pls.' Int., Defs. Hr. Ex. 15, Doc. 212-5 at 26);

- Copies, of all training manuals, employee instructions, and other communications to employees regarding GTL's policies or practices with respect to "inactive" ICS and AdvancePay accounts, (*id.*);

- All documents showing or reflecting the dates your IVR telephone system recordings were used and in effect, (*id.* at 27.)

- All documents related to any changes made to your IVR telephone system recordings, (*id.*);

- Documents related to the reason(s) GTL made any change to its IVR telephone system recordings, (*id.*);

- All intra-corporate communications—including emails, memoranda, letters—in which the practice of reducing account balances to $0.00 based on inactivity is discussed. (*id.*).

Based on these representations, Plaintiffs believed the 2010 Master Prompt List included the prompts customers heard when they called GTL's automated line.

### ii. *Mr. Baker Testified As GTL's 30(b)(6) Deponent That GTL's IVR Script Contained The "May Expire" Statement.*

GTL's 30(b)(6) representative, John Baker, was identified to testify as GTL's corporative representative with respect to how GTL communicates its inactivity policy to its customers. (Baker Dep., Doc. 88 at 8:9–17) (Not. of Dep., Doc. 46 at 5.) Mr. Baker testified on September 14, 2017. (Baker Dep., Doc. 88 at 1.) At the time of his deposition, Mr. Baker was no longer a GTL employee, but was a consultant for GTL. As a consultant, he "primarily provides witnessing and deposition work for [GTL's] legal department." (*Id.* at 23:6–24:8.)  Indeed, Mr. Baker has testified in other GTL legal cases in which GTL's fee charging practices were at issue. Before his current work as a consultant, Mr. Baker was GTL's "[s]enior vice president responsible for payment services." (*Id.* at 22:14–16.) Through this role, he was responsible for prepaid accounts and oversaw GTL's

AdvancePay product. (Sanctions Hr. Trans. II, Doc. 210 at 16:22–17:2.) He was also in charge of the deposit aspect of GTL's IVR system. (*Id.* at 52:13–18.) Mr. Baker prepared for his 30(b)(6) deposition for ten hours. (Baker Dep. Trans., Doc. 88 at 11:4–7.)

At the deposition, Mr. Baker flipped through the 2010 Master Prompt List (produced at "GTL_Githieya_0000001"), and then testified that the 2010 Master Prompt List was "a comprehensive list of the recordings that one would hear in the IVR system." (Baker Dep. Trans., Doc. 88 at 189:4–12); (Video of Dep., Doc. 228, Slide 63.) Plaintiffs' counsel then asked Mr. Baker if GTL had made any changes to the 2010 Master Prompt List as it related to inactivity or refunds, and Mr. Baker responded that there had not been any changes. (Baker Dep. Trans., Doc. 88 at 188:3–10.) Later on in the deposition, Plaintiffs' counsel asked Mr. Baker a second time if the 2010 Master Prompt List was "the script that GTL used during the relevant time period in this case?" Again, Mr. Baker responded, "Yes. Correct." (Baker Dep. Trans., Doc. 88 at 195:15–22.) Importantly, Mr. Baker's deposition anchored the understanding that the 2010 Master Prompt List was the operative script GTL used during the time period of this case. Thus, GTL led Plaintiffs to believe that anyone who called GTL to set up an account would have heard GTL's inactivity statement.  And indeed, this was a central defense that GTL asserted.

Mr. Baker initially testified that GTL's website discloses its inactivity policy. (Baker Dep., Doc. 88 at 60:16; 84:1-2, 9-11.) Later, Mr. Baker testified that GTL in fact no longer discloses its inactivity policy on its website as "[o]ur formal policy is

we no longer tell customers that accounts will time out after 90-day[s] because they can request a refund at any point." (*Id.* at 163:14–16.) Then, contrary to his prior testimony that call center personnel were required to advise customers of the inactivity policy because it's in their training manual (*id.* at 84:16-85:4), Mr. Baker ultimately explained that GTL does not "ask or require [] call center personnel to inform customers of the 90-day inactivity policy." (*Id.* at 208:21–209:10.) Mr. Baker only provided this testimony after Plaintiffs' counsel questioned him regarding the conflict in his testimony, i.e. that Mr. Baker had earlier testified that GTL did in fact disclose its inactivity policy (the forfeiting of the account balance) on the frequently asked questions portion of it website and over the phone to customers who sign up for AdvancePay accounts through live operators. (*Id.* at 83:18–85:11; 161:13–163:16; 208:21–209:10.)   This zig zag in Mr. Baker's testimony proceeded exponentially at the sanctions hearing.

### iii. *Plaintiffs Sought to Confirm GTL's Production and Deposition Testimony Through An Interrogatory.*

After the Baker Deposition, Plaintiffs asked GTL in an interrogatory to "identify each date on which GTL made any change, modification, alteration, or amendment of any kind to . . . call scripts for any IVR system relating in any way to Advance Pay Accounts or other prepaid accounts." (Def.'s Resp. to Pls.' Third Interrog., Doc. 168-3 at 13.) On November 2, 2017, GTL responded by referring Plaintiffs to GTL's responses to other interrogatories and requests for production. Specifically, GTL stated "the answer to this interrogatory may be determined by

examining and summarizing the documents that GTL has produced, or will produce, in response to Plaintiff's [sic] RFP Nos. 10, 18, 30–31, and 33–34, and the burden of ascertaining an answer will be substantially the same for either party." (*Id.*) GTL then referred Plaintiffs to specific documents. (*See id.*); (Doc. 200-1) (compiling documents identified in response to Int. No. 20.) Mr. Baker verified GTL's response. (*See* Def.'s Resp. to Pls.' Third Interrog., Doc. 168-3 at 15.) The Court reviewed the documents GTL identified and none of these documents identify a date that GTL made changes to the IVR script or that GTL made any changes to the IVR script.

In sum, as discovery drew to a close, GTL had produced and identified the 2010 Master Prompt List as the operative document that showed Plaintiffs what callers actually heard when they called the IVR. The 2010 Master Prompt List included the "may expire" statement. GTL also identified the 2010 Master Prompt List as responsive to several of Plaintiffs' interrogatories and requests for production regarding GTL's communication of its inactivity policy to customers. (*See*, *e.g.*, August 8, 2017 Letter from Def.'s Counsel to Pls.' Counsel Suppl. GTL's Resp. to Pls.' Int., Defs. Hr. Ex. 15 at 4 (identifying the 2010 Master Prompt List as responsive to Plaintiffs' request for "[c]opies of all iterations of your interactive voice response (IVR) telephone system recordings.")). Then, GTL provided corporate testimony that the 2010 Master Prompt List was "a comprehensive list of the recordings that one would hear in the IVR system." (Baker Dep. Trans., Doc. 88 at 189:4–12); (Video of Dep., Doc. 228, Slide 63.)

Plaintiffs relied on GTL's production, deposition testimony, and interrogatory responses when they filed their Motion for Class Certification on April 13, 2018. (Docs. 122, 123.) Discovery closed a few days later on April 15, 2018. (Scheduling Order, Doc. 66 at 2.) Defendants responded to Plaintiffs' Motion for Class Certification on May 25, 2018. (Doc. 137.)

      c.   *In GTL's Response to Plaintiffs' Motion for Class Certification, GTL Employed The "May Expire" Statement as Its Central Defense.*

In GTL's Response to Plaintiffs' Motion for Class Certification, GTL argued that because "the automated telephone script . . . *expressly* discloses the inactivity policy . . .", (GTL Resp. to Class Cert., Doc. 137 at 10), Plaintiffs' "theory of liability is not susceptible to class treatment . . . ." (GTL Resp. to Class Cert., Doc. 137 at 23.) This is GTL's primary defense to Plaintiffs' Motion for Class Certification. For example, GTL argues that Plaintiffs cannot satisfy Rule 23(a) because their theory of liability cannot be resolved on a class wide basis with common evidence "because they can only recover if this Court ignores an express statement in the IVR script they cite as the 'contract,' as well as GTL's other disclosures, informing account holders of the inactivity policy." (Def.'s Resp. to Pls.'s Mot. for Class Cert., Doc. 137 at 23); (*see*, *e.g.*, *id.* at 10 ("Plaintiffs even ask the Court to ignore large chunks of the automated telephone script—the same script that they argue is the contract—which expressly discloses the inactivity policy"), 11 ("Plaintiffs do not dispute that GTL disclosed the inactivity policy in many ways, including in the automated script itself . . . ."), 13–14, 17, 23, 25–28, 33, 47.)

### d. Plaintiffs Uncovered that GTL Removed The "May Expire" Statement From Its Script and Sought Court Intervention.

Shortly after discovery closed, Plaintiffs' counsel placed an investigatory call to GTL's automated line. (Recording, Doc. 166.) The "may expire" statement was not played. (*Id.*) Shocked by this discovery, Plaintiffs' counsel sent GTL's counsel a letter demanding that GTL disclose when it had removed the "may expire" statement from the script. (*See* Letter from Plaintiffs' Counsel to GTL's Counsel, May 29, 2018, Doc. 168-4.) In response, GTL's counsel insisted that it had complied with its discovery obligations. (Letter from GTL Counsel to Plaintiffs' Counsel, June 5, 2018, Doc. 168-5.) While GTL did not dispute that the "may expire" statement was removed, GTL refused to answer Plaintiffs' question regarding when it removed the statement. (*Id.*) GTL's counsel then accused Plaintiffs' counsel of violating Georgia's Rules of Professional Conduct (by placing a call to GTL's automated phone line) and threatened to file a motion for sanctions. (*Id.* at 2.)

The Parties brought this matter to the Court's attention in a Corrected Joint Discovery Statement. (*See* Corr. Joint St., Doc. 141.) Plaintiffs explained in their portion of this statement that despite multiple requests for production, depositions, interrogatories, and extensive document production,[5] Plaintiffs only recently discovered that the "may expire" statement does not currently exist or play on GTL's IVR. (*Id.* at 2.) In GTL's response, GTL insisted that "each of the named

---

[5] By the close of discovery, GTL had produced 92,779 pages of documents. (*See* Log of GTL Doc. Prod., Doc. 215-1 at 3.)

Plaintiffs would have heard the inactivity prompt, such that this supposedly 'new' evidence is irrelevant to their claims." (Corr. Joint St., Doc. 141 at 7.) GTL contended that "this issue affects none of the Plaintiffs who would likely have heard the inactivity prompt when signing up for an account . . . ." (*Id.* at 5.) GTL accused Plaintiffs of "surreptitiously" recording a call to GTL. (*Id.*) GTL also argued that a review of previously produced documents "would have identified any changes made to the AdvancePay intake IVR script, or when particular prompts were played." (*Id.* at 6.) According to GTL, "the identified documents confirm that the script did not change *very much* over time, and that the inactivity prompt did not change from 2009 through the date of the Complaint, which would have included the time that each Plaintiff signed up over the phone." (Corr. Joint St., Doc. 141 at 7) (emphasis supplied).

After the Parties submitted their Joint Statement, the Court held a teleconference. (*See* Teleconf. Trans., Doc. 147). During the teleconference, GTL's counsel argued that GTL's responses to Plaintiffs' requests about the script "were not inaccurate." (Teleconf. Trans., Doc. 147 at 8:24.) GTL also argued to the Court that it had provided the master lists for prompts (*Id.* at 9:10–12), conducted an extensive search and provided "all of those documents" (*Id.* at 14:23–25), that there was nothing else that GTL could provide that had not already been provided (*Id.* at 9:16–18), and that any new 30(b)(6) witness "would be relying upon the same documents that are in plaintiffs' possession." (*Id.* at 10:10–12.)

e. *The Court Issued a Discovery Order Directing Defendants to Identify When It Made Changes to the IVR.*

Despite GTL's assertions, the Court issued a Discovery Order (Discovery Order) reopening GTL's 30(b)(6) deposition and directing GTL to provide a full response to Plaintiffs' Interrogatory No. 20. (*See* Discovery Order, Doc. 145) (ordering Defendant to, among other things, "identify each date on which GTL made any change, modification, alteration, or amendment of any kind to . . . call scripts for any IVR system relating in any way to Advance Pay Accounts or other prepaid accounts.") In Interrogatory No. 20, Plaintiffs specifically asked GTL to "identify each date on which GTL made any change, modification, alteration, or amendment of any kind to . . . call scripts for any IVR system relating in any way to Advance Pay Accounts or other prepaid accounts." (Def.'s Resp. to Pls.' Third Interrog., Doc. 168-3 at 13.)

f. *GTL's Supplemental Production in Response to This Court's Discovery Order Revealed That GTL Removed the "May Expire" Statement Before this Litigation Commenced.*

GTL's supplemental document production revealed that on January 7, 2014, over a year before this litigation commenced, GTL removed the "may expire" statement from the IVR. (GTL's Second Supp. Resp. to Pls.' Third Set of Interrog., Doc. 168-8 at 7.) This change was actually the first of two significant overhauls GTL made to its IVR script. GTL did not inform Plaintiffs of either of these overhauls during discovery.

As a part of the first overhaul, in 2014, GTL changed the language of the script to take out language that required users to make a minimum deposit. On the

technical side of things, when GTL made this change it added additional files to the master prompt list. ("GTL_Githieya_0093155," Pls. Hr. Ex. 328, Doc. 152-6 at 7–8.). These files contained variable-deposit prompts. As a part of this change, GTL removed the "may expire" statement from the deposit prompts that were actually played on the IVR. (*Id.*) Second, in 2016, GTL again revised its IVR script. As a part of this overhaul, GTL removed the minimum deposit feature entirely to comply with the FCC's October 2015 Order.[6] (Hr. Trans. II, Doc. 210 at 54:2–55:12.) To coordinate making these changes to its IVR script, GTL employees sent both internal and external emails discussing the change. (*See*, *e.g.*, Oct. 8, 2013 Email, Doc. 152-8; Jan. 9, 2014 Email, Doc. 152-10.) Members of GTL's leadership team received these emails. (*Id.*)

GTL produced over five hundred additional pages of documents after the Court's Discovery Order of June 25, 2018 (Discovery Order, Doc. 145). These documents explain the two overhauls that GTL made to its IVR in 2014 and 2016. On July 10, 2018, GTL produced:

- Two previously unproduced Master Prompt Lists (January 2014 Master Prompt List, "GTL_Githieya_0093155", Pls.' Hearing Ex. 328, Docs. 152-6, 211-26 at 1–8 and 2016 Master Prompt List, "GTL_Githieya_0093239," Pls.' Hearing Ex. 350, Docs. 152-7, 211-1 at 22–28);

---

[6] Report and Order And Third Further Notice of Proposed Rulemaking, WC Docket No. 12-375, 13-113 (2013) (available at Pls. Hr. Ex. 323).

- Five Call Flow documents:

  o January 31, 2014 Call Flow, "GTL_Githieya_0093201," Pls.' Hearing Ex. 331, Doc. 211-24 at 53–64;

  o January 2015 Call Flow, "GTL_Githieya_93186," Pls.' Hearing Ex. 442, Doc. 211-36;

  o February 2015 Call Flow, "GTL_Githieya_0093170," Pls.' Hearing Ex. 441, Doc. 211-35;

  o 2016 Call Flow, "GTL_Githieya_93251," Pls.' Hearing Ex. 444, Doc. 211-1 at 8–20;

  o 2018 Call Flow, "GTL_Githieya_0093245," Pls.' Hearing Ex. 415, Doc. 215-25 at 1–6); and

GTL also produced emails showing the intensive process involved in changing the deposit function of the IVR, which resulted in removing the "may expire" statement. (Pls.' Hr. Ex. 324, "GTL_Githieya_0092955") (internal GTL email discussing changes to the IVR deposit prompt); (Pls.' Hr. Ex. 330, "GTL_Githieya_0092780") (internal GTL email confirming implementation of change to deposit function of IVR); (Doc. 152-9, "GTL_Githieya_0093264") (internal GTL email describing the switch to variable-deposit prompt). GTL determined from one of these emails that it removed the "may expire" statement in January of 2014. (*See* GTL's Second Supp. Resp. to Pls.' Third Set of Interrogatories, Doc. 168-9 at 7) (citing Doc. 152-10, ""GTL_Githieya_0092780").

GTL, for the first time, identified previously produced, but not specifically identified, documents relevant to this change and produced 538 pages of additional relevant documents. (*See* GTL Production Log, Doc. 215-1 at 4.) In Response to Plaintiffs' Motion for Sanctions, GTL maintains that it produced documents identifying these changes during discovery. The Court reviews these documents:

### i. 778 Document

The first document GTL contends it produced that proves that GTL was not withholding documents is GTL_Githieya_778. (GTL's Resp. in Opp. to Sanctions, Doc. 171 at 16–17) (Document available at Pls.' Hr. Ex. No. 426). GTL describes the 778 document as the "IVR Master Prompt List." (*Id.* at 7–8, n. 3.) "GTL_Githieya_778" was originally produced during discovery as a 72-page non-searchable PDF printout of an Excel spreadsheet. (*See* GTL_Githieya_778, Pls.' Hr. Ex. No. 426).

A review of the 778 document does not alert the reader to what he or she is looking at. There is no title at the top of the 778 document and nothing on it to alert the reader to what the 778 document is. The list of prompts does not appear until the 25th page. (*See* Doc. 152-24 at 25; Pl.'s Ex. 426 at 25; GTL_Githieya_0000802.) The first twenty-four pages display columns A-D and 13 rows. These cells display: Column A: the Platform (either "Internal Phone System" or "InContact"); Column B: "DID" (there is no description or explanation for what "DID" stands for but some of the entries display a phone number);

Column C: "PIN" (many of these cells are blank but in some there is a four digit code); Colum D: "Description" (most of the cells in this column have a short description such as "APIVR" and then a series of numbers). The Court provides a screenshot of the first page of the 778 document:

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Platform | DID | PIN | Description |
| 2 | Internal Phone System | (972) 769-5931 | 1234 | Puerto Rico DOC Recording Only |
| 3 | Internal Phone System | (205) 598-3204 | 1234 | Birmingham AL City Jail, Bolivar County MS, & Box Elder UT Recording Only |
| 4 | InContact | - | - | APIVR - 4592978 |
| 5 | InContact | - | - | Altoona - 4593043 |
| 6 | InContact | - | - | APIVR - 4592978 |
| 7 | InContact | - | - | CA APIVR - 4593575 |
| 8 | InContact | - | - | DRB IVR - 4593043 |
| 9 | InContact | - | - | LA IVR - 4593363 |
| 10 | InContact | - | - | MI APIVR - 4592948 |
| 11 | InContact | - | - | P2T IVR - 4593744 |
| 12 | InContact | - | - | Pin Debit - 4592750 |
| 13 | InContact | - | - | Trust Fund - 4592947 |

According to GTL, the 778 document "contained complete information regarding IVR Script changes, which at the very least reflected that a change was

made to the inactivity policy notification prompt in 2016." (Def.'s Resp., Doc. 171 at 13) (citing Doc. 152-3 at row 104.) The row GTL cites to support this assertion is a prompt that states:

> Please have your Visa, Mastercard, or Discover card ready. We accept deposits from $5 to $100 in $1 increments. Initial deposits will include a $3.00 transaction fee. Please enter the amount you wish to fund. For Example, to fund 5 dollars, enter the number 5. To fund 60 dollars, enter 6-0. Enter the amount now.

(Doc. 152-3 at row 104.) This row also states this information in Spanish and provides a few more prompts telling users how much they will be depositing and that their credit card will be charged. (*Id.*) In the column to the right side, there is a date, "3/15/16." Notably, the "may expire" statement is absent from this deposit prompt. A partial screenshot of the row GTL cites to:

Yet the 778 document does not reveal that a change was made to the IVR because it also contains a row with the "may expire" statement. (*See* Doc. 152-3 at 2, row 4.) There is no indication in the document that some prompts are in use and others are not. As the Court explains below, it is impossible to know from consulting only a Master Prompt List alone which prompts are played at any given time. To know which prompts are in use, the reader must also consult a call flow document. Thus, neither the row Defendant cites — nor the 778 document — provide complete information about IVR script changes.

Further, while GTL identified this document as responsive to several of Plaintiffs' interrogatories and requests for production, it did not label or categorize the document as a Master Prompt List. GTL identified this document as responsive to Plaintiffs' Interrogatory No. 10 and Request Nos. 7, 8, 10, 18, 26, 30, and 33. (*See* Def. Hr. Ex. 15, Doc. 212-5 at 23.) In Interrogatory No. 10, Plaintiffs asked GTL to "[i]dentify all intra-corporate communications—including emails, memoranda, letters—in which the practice of reducing account balances to $0.00 based on inactivity is discussed." (Def.'s Hr. Ex. 14, Doc. 212-5 at 14.) And, in Plaintiffs' Request No. 26, Plaintiffs requested "[c]opies of all iterations of your interactive voice response (IVR) telephone system recordings." (*See* Def. Hr. Ex. 15, doc. 212-5 at 26.) Based on GTL's identifications, it would not have been clear to Plaintiffs (a) what the 778 document was; (b) if the 778 document reflected an intra-corporate communication, such as a plan; or (c) if the 778 document was a copy of the IVR recording.

Most notably, Mr. Baker, GTL's 30(b)(6) witness, never referenced the 778 document in his deposition in response to pointed relevant questions posed by Plaintiffs' counsel.  This was not a mere unintentional error, as made clear by the entire course of GTL's presentation of evidence and the testimony of both Mr. Baker and Mr. Montanaro, GTL's other 30(b)(6) witness.  And indeed, the entire fabric of Mr. Baker's testimony and GTL's relevant discovery responses were a patchwork of shifting answers designed to conceal and confuse.

### ii.   *2014 Master Prompt List and Call Flow Documents*

GTL also argues that during discovery it produced two emails that reflect that it removed the "may expire" statement. First, on November 17, 2017, GTL produced an April 7, 2014 email with two attachments. ("GTL_Githieya_0039655") (Flash drive with Email and Attachments, Doc. 230); (*see* Log of GTL's Doc. Production, Doc. 215-1 at 3.) The April 7, 2014 email is from a GTL employee to two consultants and one other GTL employee. (April 7, 2014 E-mail, Doc. 200-2 at 2.) The subject line is "Initial Documentation." (*Id.*) One of the attachments, titled "documents.zip," contained 17 individual documents totaling 275 pages. (*Id.*) The only description of the attached .zip file in the email states that the .zip file has "all the documents as well as a spreadsheet with the names, platform, notes, and type for each IVR." (*Id.*) The .zip file "identified the separate email and various attachments." (Resp. to Ord., Doc. 203 at 1.) This 275-page zip file contains a "2014 Master Prompt List." ("GTL_Githieya_0039709," Doc. 200-

2 at 56) and an April 2014 Call Flow ("GTL_Githieya_0039717," Doc. 200-2 at 64).[7]

These documents do not reveal that the "may expire" statement was not playing. In fact, there is a prompt in the "2014 Master Prompt List" that contains the "may expire" statement. (*See* AdvPay_1010Eng.wav at "GTL_Githieya_0039710," Doc. 200-2 at 5.) Rather, to know what was *actually* played the reader would need to match the prompt titles from the Call Flow document to the .wav titles in the Master Prompt list. If the reader knew to do this, she would see that this call flow document does not cite the prompt with the "may expire" statement, but cites to another deposit prompt. ("GTL_Githieya_0039721," Doc. 200-2 at 68.)

However, neither Mr. Baker, GTL's 30(b)(6) witness nor any other GTL disclosure described or explained this to Plaintiffs. In the absence of such an express and requisite disclosure, there was no way Plaintiffs' counsel would have been able to identify that GTL was using a different IVR beginning in 2014 than Defendant had consistently represented Plaintiffs would have heard. To illustrate how confusing and non-transparent the call flow document is, the Court provides a screenshot of the page of the call flow document that Plaintiffs needed to decipher to figure this out. The screenshot the Court provides is exactly the size of the PDF produced by Defendants.

---

[7] Both the 2014 Master Prompt List and April 2014 Call Flow were produced again after discovery closed on July 10, 2018. (*See* Doc. 203.)



# Deposit Selection

4/7/2014

Begin

Platform?

No — Yes

Web Service
getDestinationInfo

Web Service
getContractInfo

Dynamic Menu calculated
Min/Max/Increment
Example: Min 25, Max 100,
Increment 25
AdvPay_1064{Lang}.wav
TTS=25
AdvPay_1065{Lang}.wav
TTS=50
AdvPay_1066{Lang}.wav
TTS=75
AdvPay_1067{Lang}.wav
TTS=100
AdvPay_1068{Lang}.wav
AdvPay_1073{Lang}.wav

TTS=Min to Max based on
Increment up to 7 selections
If more than 7 deposit
selections available restart
menu at next value when 8 is
selected

AdvPay_1060{Lang}.wav
TTS={MinDep}
AdvPay_1061{Lang}.wav
TTS={MaxDep}
AdvPay_1062{Lang}.wav
TTS={Increment}
AdvPay_1063{Lang}.wav

Play
AdvPay_1076{Lang}.wav

True — Is Increment<10

Capture
caller input

Does input meet
deposit
requirements?

No

Play
AdvPay_1077{Lang}.wav

Yes

Repeat

Loop 2X

Finished

Dynamic Menu

**Play**
AdvPay_1003{Lang}.wav

WebService
**WriteLog**
Page 173

Repeat

To Adv.
Pay 3
(A)

9

1/2/3/4/5/6/
7/8/9/Else

8   Else

Loop 2X

Finished

1/2/3/4/5/6/7

**Play**
AdvPay_1074{Lang}.wav
TTS={DepAmount}
AdvPay_1075{Lang}.wav

2, Else — 1 / 2 / Else

1

To
Get Fee

If Platform — False

Play
AdvPay_1048{Lang}wav

True

Play
AdvPay_1046{Lang}wav

DTMF Send
#

Blind Transfer
866.230.7761

Hang Up

5

GTL_Githieya_0039721

In fact, Defendant's new found reliance on the call flow chart was hogwash. While GTL produced the April 7, 2014 email ("GTL_Githieya_0039655") during discovery, GTL did not identify it as a responsive document that should have put Plaintiffs on notice of changes to the IVR until *after* Plaintiffs filed their Motion for Sanctions — months after the close of discovery and after Plaintiffs filed their Motion for Class Certification. (*See* Hr. Trans. I, Doc. 209 at 70:23–71:1.) The April 7, 2014 email ("GTL_Githieya_0039655") was also not identified in response to this Court's Discovery Order of June 25, 2018. (*Id.*) (Discovery Order, Doc. 145.)

The second email GTL identifies as evidence that it was not withholding documents is an April 17, 2014 email from a GTL employee to two third parties and three GTL employees. ("GTL_Githieya_0039980.") (Pls.' Hr. Ex. 476). The April 17, 2014 email was produced on November 17, 2017. (*See* Log of GTL's Doc. Production, Doc. 215-1 at 3.) The subject line is "Kickoff Call - Auto Reload." (Pls.' Hr. Ex. 476). It contains three Word files, including a master prompt list and a call flow document. (Pls.' Hr. Ex. 476). There is nothing in the body of this email or the subject line to alert Plaintiffs to its importance. *Moreover, GTL did not identify "GTL_Githieya_0039980" as responsive to any of Plaintiffs' requests until March 6, 2019 — the Wednesday before the Sanctions Hearing and ten months after the close of discovery.* (Hr. Trans. I, Doc. 209 at 71:10–14.)

### iii. The Court's authorization of a continuation of GTL's 30(b)(6) Deposition

Based on the discovery non-disclosure issues raised by Plaintiffs, the Court authorized Plaintiffs to continue its 30(b)(6) deposition of GTL. The Court specified that the deposition should be limited in scope to include the following topics:

- Any changes made to the AdvancePay [] script used by Defendant and information related to such changes;
- Any document relating to AP script changes;
- Any information that clarifies the meaning of documents Defendant has identified as pertaining to AP script changes;
- Any information and documents that relate to when the "may expire" statement was removed from deposit prompt script language; and
- Any information and documents that relate to changes made to an IVR script in another program offered by Defendant that might provide contextual information.

(Discovery Order, Doc. 145 at 2.)

GTL identified Stephan Montanaro as its 30(b)(6) witness. Mr. Montanaro had been employed with GTL for eleven years. (Montanaro Dep., Doc. 152 at 9:19–20.) For the two years preceding his deposition, Mr. Montanaro had been the Vice-President of Consumer Channels at GTL. (*Id.* at 9:11–18.) In this role, he oversaw the technologies that consumers used to interact with GTL, including the IVR and the AdvancePay product. (*Id.* at 12:3–13:9.) (This is the same role that Mr. Baker had before leaving GTL to start consulting for GTL.) (*Id.* at 13:10–16.) Before this, Mr. Montanaro oversaw and was responsible for GTL's responses to customers'

Requests for Proposals and was also the Vice-President of Sales and Marketing Operations. (*Id.* at 10:1–17.)

At the Court-authorized deposition, taken on July 19, 2018, Mr. Montanaro testified that he did not know until he was preparing for his deposition that the "may expire" statement was removed from GTL's IVR script or about the change from a fixed to variable-deposit prompt. (Hr. Trans. I, Doc. 209 at 207:12–24.) He also testified that he first became aware of this case thirty days before his deposition (Montanaro Dep., doc. 152 at 18:24–19:2), that he was not involved in either providing information or documents to counsel in this case (*id.* 14:6–10), that in preparing for the deposition he spoke with four GTL employees (*id.* at 19:3–21:8), and that he did not speak with Mr. Baker, GTL's first 30(b)(6) witness, in preparing for the deposition (*id.* at 50:16–18). Mr. Montanaro did not speak to any policy-makers in preparation for his deposition. (Hr. Trans I., Doc. 209 at 223:2-13.)

During his deposition, Mr. Montanaro explained to Plaintiffs what a call flow document is and how GTL uses it. Mr. Montanaro explained that a call flow was "the step-by-step sequence of the AdvancePay IVR." (Montanaro Dep., Doc. 152 at 58:12–16.) Mr. Montanaro also clarified GTL's process when it made a material change to its IVR script: GTL's approval process involved dozens of personnel, including the company's president and other executives. (*Id.* at 78:1–80:25, 87:11–93:8) The process also generated multiple documents, including "approval" documents detailing the change and the process undertaken to implement it, a

35

revised "Master Prompt List," and an updated "Call Flow" document. (*Id.* 15:6–16:17; 80:17–84:7; 86:3–87:18.)

Mr. Montanaro testified that "GTL was not aware that the inactivity prompt had been removed from its AdvancePay IVR until the last 30 days." (Montanaro Dep., Doc. 152 at 170:12–21; *see also id.* at 172:15–173:22; *id.* at 176:15–179:1.) According to Mr. Montanaro, "it was only within the past 30 days that [GTL] learned" that the prompt was no longer being played. (*Id.* at 165:24–166:24.) After Mr. Montanaro's deposition, GTL filed an errata converting this portion of Mr. Montanaro's deposition testimony from corporate to personal testimony. (*See* Errata to Montanaro Dep., Doc. 154 at 1–3.) Specifically, at the deposition, Plaintiffs' counsel asked: "it's your testimony today, that no one at GTL was aware of the fact that they removed that inactivity prompt until over four years later, after the Court entered its Discovery Order in this case on June 25, 2018." Mr. Montanaro testified "Yes." In the errata, GTL changed this testimony to "No. My review of Exhibits 209 and 210 indicates that the inactivity prompt was removed in 2014 and therefore persons at the Company were aware that it was removed at that time." (Errata to Montanaro Dep., Doc. 154 at 3.) In discussing the errata correction to his testimony, Mr. Montanaro testified at the Sanctions Hearing that "my errata sheet was to be more precise to align [to what] we knew[,] that the prompt was removed but not necessarily that the statement was removed." (Hr. Trans. I, Doc. 209 at 209:10–12.) But, his errata submission conveniently changed

his testimony from corporate to personal testimony, as opposed to reflecting a change in corporate knowledge.

After admitting (finally) to the change in the IVR at his deposition, Mr. Montanaro then testified that GTL's prior representations to the contrary were still true. Plaintiffs' counsel confronted Mr. Montanaro with GTL's corporate testimony via Mr. Baker and contained in GTL's portion of the Parties' Corrected Joint Discovery Statement that the IVR "did not change very much over time, and that the inactivity prompt did not change from 2009 through the date of the Complaint." (Corr. Jnt. St., Doc. 141 at 7.) According to Mr. Montanaro, these were accurate statements because "[t]he file exists and continues to exist, [it's] just that . . . we stopped playing it on January of 2014." (Montanaro Dep., Doc. 152 at 159:4–25; 160:12–15.) In other words, GTL purportedly had made an accurate statement because the pre-2014 "may expire" audio notice file exists somewhere in GTL's library of audio files — a remarkable assertion.

Mr. Montanaro also testified that he did not know whether at any time during the course of discovery in this case if anyone at GTL had asked or performed any investigation regarding whether the inactivity prompt was still playing on the IVR. (Montanaro Dep., Doc. 152 at 178:3–179:2.) GTL did not change this portion of Mr. Montanaro's testimony to personal testimony. (*See* Errata to Montanaro Dep., Doc. 154.)

### g. Plaintiffs Filed the Instant Motion for Sanctions.

Plaintiffs allege in their Motion for Sanctions that GTL withheld key evidence, presented false testimony and false statements to this Court, and violated the Court's Discovery Order in an attempt to deceive Plaintiffs and the Court. Plaintiffs contend that GTL has conducted discovery in bad faith and perpetrated a fraud on the court. (Pls.' Mot. for Sanctions, Doc. 168 at 24.) Plaintiffs request that the Court: strike GTL's answer and hold GTL in default (Pls.' Post-Hr. Brief., Doc. 220 at 21.); enter an order establishing the existence and terms of GTL's contracts with Plaintiffs and the members of the class (*id.* at 22); or, alternatively, preclude GTL from offering evidence regarding the "may expire" statement. (*Id.* at 24–25.) Plaintiffs also argue that the Court should strike GTL's class certification brief. (*Id.* at 26.) Finally, Plaintiffs request that the Court order GTL to pay the fees Plaintiffs incurred in their effort to discover the terms of GTL's automated script and seek relief as to GTL's misconduct. (*Id.* at 27.)

Specifically, Plaintiffs allege that despite their repeated discovery requests for copies of all iterations of GTL's IVR recordings, GTL produced an obsolete call script and falsely testified under oath that the script had not changed. The only call script intelligibly produced — the 2010 master prompt list — included the "may expire" statement. This document and Mr. Baker's deposition testimony naturally led Plaintiffs to believe that all callers, including all putative class members, heard the "may expire" statement during the IVR phone communication.  And indeed,

most importantly, this was GTL's consistent position and defense during most of the litigation.

In opposing Plaintiffs' Motion for Class Certification, GTL relied on the "may expire" statement and represented to the Court that class certification was inappropriate because callers heard and agreed to the "may expire" statement. After Plaintiffs discovered that GTL had removed this statement from the recording, Plaintiffs allege that GTL continued to mislead Plaintiffs and the Court by refusing to answer when the statement had been removed and making false assertions in briefs and during the Court's discovery teleconference of June 25, 2018. Plaintiffs claim that GTL's Court-ordered document production and deposition confirmed that its prior statements were false and that it failed to comply with its discovery obligation.

Finally, Plaintiffs claim that GTL offered "additional demonstrably false testimony" at the Court-ordered deposition of Mr. Montanaro. First, "GTL insisted its statement to the Court that 'that the inactivity prompt did not change from 2009 through the date of the Complaint' was 'accurate'" because "'the file exists and continues to exist, just that . . . we stopped playing it on January of 2014.'" (Pls.' Mot. for Sanctions, Doc. 168 at 19–20) (citing Montanaro Dep., Doc. 152 at 159:4–160:20). Second, Mr. Montanaro testified that "no one at GTL was aware that the inactivity prompt no longer played" on the main AdvancePay IVR until after this Court's June 25, 2018 Order. (Pls.' Mot. for Sanctions, Doc. 168 at 21) (citing Montanaro Dep., Doc. 152 at 170:17–21, 172:15–23, 173:13–22.) Third, Mr.

Montanaro repeatedly testified that it was "only within the past 30 days that [GTL] learned" that the "may expire" prompt was removed. He also testified that prior to that date, no one at GTL was aware of the fact that they removed the "may expire" prompt for over four years until after the Court entered its Order in this case on June 25, 2018. (Pls.' Mot. for Sanctions, Doc. 168 at 21) (citing Montanaro Dep., Doc. 152 at 164:24–166:5, 176:15–177:2.)

Due to Mr. Montanaro's clear ignorance, Plaintiffs allege that GTL intentionally under-prepared Mr. Montanaro to avoid answering Plaintiffs' deposition questions. (Pls.' Mot. for Sanctions, Doc. 168 at 21 at 20.) Plaintiffs also contend that by filing an errata converting critical aspects of Mr. Montaro's deposition from corporate to personal testimony, GTL violated this Court's Discovery Order to provide responsive 30(b)(6) testimony. (*Id.* at 22.)

GTL argues that it did not withhold evidence. It contends: (1) Plaintiffs are simply confused about the terms GTL uses (GTL Resp. in Opp. to Sanctions., Doc. 171 at 8, n. 3). (2) Plaintiffs personally and their counsel had notice that the "may expire" statement was not on the IVR because they called the IVR to set up accounts (*Id.* at 8–12). (3) GTL's production disclosed that the "may expire" statement was not played after 2014 (*Id.* at 12–16), (4) GTL's deponents did not prevent Plaintiffs from discovering that the recording had changed (*Id.* at 16–17). (5) GTL and its corporate representatives were purportedly innocently or in good faith mistaken in some of their testimony and innocently had not prepared to answer specific questions as to relevant subject matter during their testimony.

(Post-hearing Sanctions Brief, Doc. 141 at 9-13).  (6) To the extent that Defendants'
course of conduct may be found to have caused a discovery detour and Plaintiffs'
additional resource expenditure, GTL should only narrowly be held responsible for
attorneys' fees associated with Plaintiffs' clarification of the date of the removal of
the "may expire" prompt language. (*Id.* at 25.)

> h.  *The Court's Hearing on Plaintiffs' Motion for Sanctions.*

After the Court set a date for a hearing on Plaintiffs' Motion for Sanctions,
GTL and GTL's lawyers retained separate, outside counsel. GTL's additional
counsel appeared on January 24, 2019 and Greenberg Traurig, LLP's own separate
counsel appeared on February 27, 2019. (Docs. 187, 188, 197.)  On March 8 and 11,
2019, the Court held the sanctions hearing.  Both Mr. Baker and Mr. Montanaro
testified. The hearing presented a number of astonishing evidentiary
developments.

For the first time, Mr. Baker testified that GTL had in fact made the decision
that "it was no longer necessary" to play the "may expire" statement on the IVR.
(Hr. Trans. II, Doc. 210 at 63:17–63:23)  Nevertheless, GTL continued — and has
continued throughout the duration of this case — to take callers' funds when their
accounts "expired" after ninety days[8] of inactivity. In short, GTL continued the
same practice of automatically appropriating Plaintiffs' funds from "inactive"
accounts, whether or not GTL advised Plaintiffs in advance on the IVR recording

---

[8] And for some accounts, according to Plaintiffs, after 180 days of inactivity.

that their accounts were subject to such an appropriation. GTL also withheld this information from Plaintiffs. But then again, despite testifying during his earlier 30(b)(6) deposition that there had not been any changes to the script as it related to inactivity — meaning that the "may expire" statement was still on the script — Mr. Baker testified during the Sanctions Hearing that he actually "wasn't certain that [the 'may expire' statement] had been removed." (Hr. Trans. II, Doc. 210 at 72:4.)

Mr. Baker further testified during the Sanctions Hearing that in providing his deposition testimony he relied on the documents that were given to him by GTL's counsel to be the most recent versions. (Hr. Trans. II, Doc. 210 at 45:18– 46:7) (testifying that the master prompt list provided to him by counsel at his deposition "was the only one I saw"). He neither clarified with counsel at his deposition that these were the most recent versions of documents nor even asked for the most recent versions. (*Id.*) Significantly, Mr. Baker also admitted at the hearing that despite verifying that GTL's interrogatory responses, which included the 778 document were correct and responsive, Mr. Baker had not reviewed the 778 document, the unreadable PDF document described above. (Hr. Trans. I, Doc. 209 at 39:14–42:1)

The Court notes again that Mr. Baker had not worked at GTL since March of 2016, (Hr. Trans. I, Doc. 209 at 53:5.), and so did not have access to GTL's computer systems, did not have a GTL email address, and if he needed a document from GTL, would need to ask GTL for that document. (Hr. Trans. I, Doc. 209 at

53:11–24.) Nevertheless, GTL used Mr. Baker as its 30(b)(6) designated witness and used him to certify GTL's discovery responses through at least January 8, 2018. (See Def.'s Supp. Resp. to Pls.' Fourth Set of Interrog., Doc. 123-40 at 7.) GTL similarly extensively relied upon Mr. Baker's testimony in *James v. Global Tel\*Link Corp.*, 13-4989, 2018 WL 3727371 (D.N.J. Aug. 6, 2018), a comparable case involving challenged phone and account charges.  In short, GTL used Mr. Baker as its professional corporate witness and was itself responsible for framing along with Baker the nature of the information he would provide and certify. He was not a witness who was a stranger to the issues in GTL litigation or made simple good faith errant, unintentional representations.

At the sanctions hearing, GTL argued that Plaintiffs were simply confused because Plaintiffs did not understand the distinction between the terms GTL used. (Hr. Trans. I, Doc. 209 at 151:14–24) (Mr. Montanaro testified that the "may expire" statement was "removed from the call flow or the phone tree. It wasn't removed from the master prompt. What the customer heard via the phone tree, it was removed from that aspect of the IVR."). The Court cautioned during the Hearing that this semantic argument was obfuscating as GTL had not made a distinction between 'script' and 'recording' until Defendants responded to Plaintiffs' Motion for Sanctions. (Hr. Trans. I, Doc. 209 at 227:19–23.)

GTL also argued that it complied with the Court's discovery order authorizing the continuation of the Plaintiff's 30(b)(6) deposition inquiries because Mr. Montanaro was prepared to answer questions about "actual changes

to the IVR script and flows." (Def.'s Post-Hr. Brief, Doc. 221 at 13.) GTL argues that the only reason why Mr. Montanaro was not prepared to answer questions about *why* the "may expire" statement was removed is because GTL did not understand that the Discovery Order included that topic. (Def.'s Post-Hr. Brief, Doc. 221 at 13; *see also* Hr. Trans. I, Doc. 209 at 176:11–177:14.)

After the sanctions hearing, the Court allowed the Parties to submit supplemental briefing, which both Plaintiffs and Defendant did. (Pls.' Post-Hr. Brief., Doc. 220); (Def.'s Post-Hr. Brief, Doc. 221.) The Court would be remiss if it did not mention GTL's about-face in this supplemental briefing. GTL admitted that "the documents did not reveal on their face, and certain key personnel of Global Tel*Link [] did not realize until belatedly, that the "may expire" statement on GTL's interactive voice response system (IVR) was removed in 2014 when GTL made a separate change from a 'fixed deposit' to a 'variable deposit' IVR prompt." (Post-Hr. Brief, Doc. 221 at 2.) Further, "[a] number of different documents had to be read together to realize that the "may expire" statement had been removed earlier than GTL believed; the relationship between the "may expire" statement and the change to a variable deposit prompt was not obvious; and it was not clear that Plaintiffs believed the "may expire" statement was important to their claims until the question first arose at class certification." (*Id.*) GTL attempts to explain away each of its misrepresentations and contends that there is no evidence that these misrepresentations were intentional.

## IV.   Analysis

Plaintiffs allege that Defendant withheld key documents during discovery that disclosed the contents of the relevant phone script, provided false testimony and information about the contents of the script, submitted inaccurate and incomplete responses to an interrogatory, repeatedly made false statements in briefs submitted to this Court and in hearings, and violated this Court's Discovery Order of June 25, 2018. Plaintiffs in turn further contend that Defendant effectively derailed the integrity of the discovery process and upended these legal proceedings in order to cloak the truth. This conduct, they assert, caused a significant waste in legal and judicial resources.  Plaintiffs urge that the totality of this conduct and its impact justify the imposition of severe sanctions.

The Court finds by clear and convincing evidence that GTL intentionally provided false information in the course of discovery, falsely verified interrogatory answers, and provided false testimony via the vehicle of Mr. Baker's 30(b)(6) deposition. And when GTL was dissatisfied with a portion of Mr. Montanaro's 30(b)(6) testimony, it converted that testimony to personal testimony that would not bind the company. GTL also intentionally relied on material misrepresentations in briefings, argument, and other testimony before the Court. GTL violated this Court's June 25th discovery order by presenting a witness who was unprepared to answer questions and altered this testimony after-the-fact, depriving Plaintiffs of Court-ordered informed corporate testimony. GTL continued its strategy of obfuscation at the sanctions hearing.

### a. GTL Withheld Key Documents Revealing that It had Removed the "May Expire" Statement from the Recording Callers Heard.

GTL withheld key documents revealing that it had removed the "may expire" statement from the recording callers heard. GTL withheld call flow documents, master prompt lists, and emails reflecting that GTL had removed "may expire" statement in January 2014.

GTL's main defense to this allegation is that it produced an up-to-date Master Prompt List during the first round of discovery and that it produced other Master Prompt Lists and Call Flow documents as attachments to emails. (*See* GTL Brief in Opp., Doc. 171 at 13.) At the Sanctions Hearing, GTL argued that these documents revealed that the "may expire" statement was not playing on the IVR. (*Id.* at 12–16.) But, GTL *now* concedes that "the documents did not reveal on their face" that the "may expire" statement was removed. (Def.'s Post-Hr. Brief, Doc. 221 at 2.) And that, "[a] number of different documents had to be read together to *realize* that the "may expire" statement had been removed." (*Id.*) (emphasis supplied).   The Court notes this concession, but views it as a material understatement of what actually occurred here.  The Court undertakes an analysis of the documents and argument GTL now offers in its defense. But it notes from the onset that GTL's express reliance on its purported disclosure of its "inactivity" account policy in their class certification briefing strongly suggests the after-the-fact artifice of this argument.

The first document GTL contends it produced that proves that GTL was not withholding documents is GTL_Githieya_778. (Def.'s Resp., Doc. 171 at 16–17)

(Pls.' Hr. Ex. No. 426). GTL describes this document as the "IVR Master Prompt List." (*Id*. at 7–8, n. 3.) GTL produced the PDF non-searchable version of this document on July 20, 2017. (Log of GTL's Doc. Prod., Doc. 215-1 at 2.) GTL did not produce a decipherable version of this document until June 8, 2018, immediately following counsel's heated discovery correspondence, and the parties' written submission of the discovery dispute to the Court on June 14, 2018.  (*Id*. at 4); (Letter from Plaintiffs' Counsel to GTL's Counsel, May 29, 2018, Doc. 168-4); (Letter from GTL Counsel to Plaintiffs' Counsel, June 5, 2018, Doc. 168-5.)

As explained above, the 778 document does not provide complete information about IVR script changes because a call flow document was required to know what was actually played. There is no indication in the 778 document that some prompts are in use and others are not. Moreover, the 778 document does not reveal that a change was made as the document contains a row with the "may expire" statement. (*See* Doc. 152-3 at 2, row 4.) The 778 document was also not produced in a reasonably usable form.

The 778 document is insufficient because to know which prompts were played, a user would need a call flow in addition to a Master Prompt List.  GTL failed to produce documents that disclosed what Plaintiffs and the putative class actually heard on the IVR — other than their continuing insistence that Plaintiffs heard the "inactivity" policy representation contained in the 2010 prompts. Mr. Baker, GTL's original and main  30(b)(6) representative, testified at the sanctions hearing, for the first time, that to actually know what was heard, you would need

to consult *both* the Master Prompt List for the language of the prompts and the specific Call Flow document in place at any given time to determine which prompts were actually played. (Hr. Trans. II, Doc. 210 at 33:10–12.) And GTL did not produce the 2014 and 2016 Master Prompt Lists until July 10, 2018 after the closure of discovery or expressly identify *any* call flow documents during the discovery period.

GTL also failed to produce the 778 document in a reasonably usable form. Federal Rule of Civil Procedure 34 requires that "[a] party [] produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request." Fed. R. Civ. P. 34(b)(2)(E)(i). "If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form." Fed. R. Civ. P. 34(b)(2)(E)(ii). The purpose is "to protect against deliberate or inadvertent production in ways that raise unnecessary obstacles for the requesting party." Fed. R. Civ. P. 34 advisory committee's notes to 2006 amendment. Importantly, "the option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation." *Id.* If a document is maintained so that it is "searchable by electronic means, *the information should not be produced in a*

*form that removes or significantly degrades this feature*." *Id.* (emphasis supplied).

The Court finds that GTL did not produce the 778 document in a reasonably usable form. The 778 document was incomprehensible as originally produced by GTL. Moreover, the 778 document was not searchable. *See In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 655 (M.D.Fla.2007) (describing the importance of searching functions and the utility of native formats). Courts consistently require parties to produce searchable documents and spreadsheets in their native format. *See*, *e.g., Dahl v. Bain Capital Partners, LLC*, 655 F. Supp. 2d 146, 150 (D. Mass. 2009). While GTL identified the 778 document as responsive to several of Plaintiffs' interrogatories and requests for production, it did not label or categorize the document as a Master Prompt List. Parties are "entitled under the Federal Rules to rationally organized productions so that they may readily identify documents, including ESI, that are responsive to their production requests." *City of Colton v. American Promotional Events, Inc.,* 277 F.R.D. 578, 585 (C.D. Cal. 2011). In the same vein, "[p]roducing parties should not raise unnecessary obstacles for the requesting party in the production of documents." *Amer. Gen. Life Ins. Co. v. Vistana Condominium Owners Ass'n,* No: 2:12–cv–01324–JAD–NJK, 2014 WL 2041950 at * 2 (D. Nev. May 16, 2014) (citations and quotations omitted).

Defendant contends that it produced the 778 document as a non-searchable PDF because the Parties had not yet entered into a confidentiality agreement. But,

49

this does not excuse Defendant from its failure to produce the 778 document in a "reasonably usable form." Nor does it excuse Defendant's failure to re-produce the 778 document in a reasonably usable form once the confidentiality agreement was shortly in place. (*See* Consent Protective Order and Confidentiality Agreement, Doc. 51) (filed on August 8, 2017). The Court notes that the Parties submitted a Consent Motion for Entry of Protective Order and Confidentiality Agreement on August 3, 2017, just thirteen days after GTL initially produced the 778 document. (Consent Mot. for Entry of Protective Order and Confidentiality Agreement, Doc. 48.)

In sum, the 778 document was not produced in a reasonably usable form as it is impossible to understand what the 778 document is. The 778 document is not searchable. GTL did not label or index the 778 document. Thus, the 778 document was so confusing and misleading to be as good as not produced. Moreover, even if it were comprehensible, what Defendant now maintains it conveys is contradicted by Defendant's primary contention throughout this litigation that the IVR included the "may expire" statement.

GTL also argues that it "did not disguise that the 'may expire' statement was no longer playing on the IVR" because it produced two internal GTL emails that had Master Prompt Lists and Call Flows attached. (Def.'s Post-Hr. Brief, Doc. 221 at 6.) But, as explained above, these documents do not reveal that the "may expire" statement was not playing. These documents are also not reasonably usable. These documents were produced on the same day that 12,068 pages of documents were

produced and were only very belatedly identified as responsive. As Defendant admits in its Post-Hearing Brief, "the documents do not reveal on their face . . . that the 'may expire statement . . . was removed in 2014." (Defs.' Post-Hr. Br., Doc. 221 at 2.) Further, GTL claims that it "was unaware of the timing of the removal of the 'may expire' statement and its connection to the implementation of the variable-deposit prompt." (Defs.' Post-Hr. Br., Doc. 221 at 3) However, this belated about-face and profession of ignorance is not now believable. GTL had to have known the content of the IVR.   GTL's discovery responses and posturing obfuscated the truth and threw up roadblocks that made Plaintiffs' deciphering of their responses into an impossible crossword puzzle.

The Court finds that GTL intentionally withheld key documents during discovery and misled the Plaintiffs.

### b. *GTL Provided False Testimony during Mr. Baker's Deposition.*

It is now clear that Mr. Baker's testimony that the 2010 Master Prompt List was "a comprehensive list of the recordings that one would hear in the IVR system" (Baker Dep., Doc. 88 at 189:8-12) is false. At the Sanctions Hearing, Mr. Baker admitted that he was a part of the team that made the decision to remove the "may expire" statement from the IVR. (Hr. Trans. II, Doc. 210 at 63:17-64:10.) While Mr. Baker claimed that he "wasn't certain that [the "may expire" statement] had been removed," he was certain that he and other GTL executives "had agreed it was no longer needed." (*Id.* at 72:2-6.) Even GTL's other 30(b)(6) witness, Mr. Montanaro, testified that it would be "immediately obvious" after reviewing the

2010 Master Prompt list that it lacked changes made in both 2014 and 2016. (Hr. Trans. I, Doc. 209 at 173:6–11.) Thus, when this litigation commenced and at the time of Mr. Baker's deposition, the 2010 Master Prompt List was an out-of-date and incomplete list of the IVR's recordings.

In its Post-Hearing Brief, Defendant argues that Mr. Baker's testimony about the 2010 Master Prompt List is not evidence of bad faith because it "was the only Master Prompt List in production available to Mr. Baker before the deposition." (Def.'s Post-Hr. Brief, Doc. 221 at 7–8) (citing Hr. Trans. II, Doc. 210 at 45:2–4) But it was GTL's responsibility to provide Mr. Baker with the correct documents. Plaintiffs did not choose Mr. Baker as GTL's representative; GTL selected him and was responsible for preparing him for his deposition. And Mr. Baker was an experienced, knowledgeable GTL executive and expert witness relative to the subject matter involved in this case. Moreover, Plaintiffs were not responsible for the production of Defendant's Master Prompt Lists — Defendant was. The 2010 Master Prompt List (GTL_Githieya_000001) "was the only master prompt list . . . available to Mr. Baker" (Def.'s Post-Hr. Brief, Doc. 221 at 8) because GTL intentionally withheld more current master prompt lists.

Mr. Baker served as GTL's 30(b)(6) witness in this and other GTL cases.[9] GTL paid Mr. Baker for his consulting services. GTL and Mr. Baker are responsible for his testimony. As Mr. Baker was involved in the decision to make changes to

---

[9] *See*, *e.g.*, *James v. GTL*, No. 16-1555 (D.N.J. filed March 29, 2017) Deposition, Pls.' Hr. Ex. 300 (February 2, 2016).

the IVR and, in fact, oversaw the IVR when the change was made, he should have been able to testify based upon his experience that the only Master Prompt List Plaintiffs had was out-of-date and therefore misleading if viewed alone. In sum, Mr. Baker provided false testimony. His testimony was not an inadvertent or innocent mistake, as Defendant suggests, but instead, part of a broader pattern of intentional bad faith misrepresentations on GTL's part.

> ### c. GTL Provided Inaccurate, Incomplete, and Misleading Interrogatory Responses.

Plaintiffs allege that GTL provided an inaccurate, incomplete, and misleading response to Interrogatory No. 20.[10] According to Plaintiffs, "GTL provided no substantive response to Plaintiffs' questions about changes to the IVR and identified documents that had nothing to do with such changes." (Pls.' Post-Hr. Brief, Doc. 220 at 10.)

The Court has reviewed the documents GTL referred Plaintiffs to in response to Interrogatory 20. The documents GTL referred Plaintiffs to were misleading and did not provide a complete response to Plaintiffs' question. Even GTL now acknowledges as much its Post-Hearing Brief. (Def.'s Post-Hr. Brief, Doc. 221 at 2, 9–10.) As the Georgia Court of Appeals has aptly explained:

> An interrogatory answer that falsely denies the existence of discoverable information is not exactly equivalent to no response. It is *worse* than no response. When there is no response to an interrogatory or the response is devoid of content, the party

---

[10] In Interrogatory No. 20, Plaintiffs specifically asked GTL to "identify each date on which GTL made any change, modification, alteration, or amendment of any kind to . . . call scripts for any IVR system relating in any way to Advance Pay Accounts or other prepaid accounts." (Def.'s Resp. to Pls.' Third Interrog., Doc. 168-3 at 13.)

serving the interrogatory at least knows that it has not received an answer. It can move the court for an order to compel a response. [] If the response is false, however, the party serving the interrogatory may never learn that it has not really received the answer to the interrogatory. The obstruction to the discovery process is much graver when a party denies having the requested information than when the party refuses to respond to an interrogatory asking if such information is available.

*Res. Life Ins. Co. v. Buckner*, 698 S.E.2d 19, 34 (Ga. Ct. App. 2010) (emphasis in original); *see also Evanson v. Union Oil Co. of California*, 85 F.R.D. 274, 278 (D. Minn. 1979) (explaining that "[a] false answer [to an interrogatory] is in some ways worse than no answer; it misleads and confuses the other party").

GTL's defenses to this false and misleading response are unavailing. While GTL concedes that its "response was incomplete" (Def.'s Post-Hr. Brief, Doc. 221 at 9), GTL contends that its response shows that it was not *intentionally* withholding documents because it identified the 778 document in Interrogatory No. 10, one of the other interrogatories it referred Plaintiffs to in its response. (*Id.* at 10.) However, as explained above, the 778 document did not provide Plaintiffs with notice of any changes to the IVR.[11] Thus, the 778 document does not on its own absolve GTL. The 778 document does not answer Plaintiffs' question and is insufficient to satisfy Defendant's discovery obligations.

There are yet more problems with this defense. Mr. Baker certified that he had reviewed the documents GTL identified as responsive to Interrogatories 10

---

[11] At the Court's Sanctions Hearing, Mr. Montanaro, GTL's post-discovery 30(b)(6) representative, testified that he would be "unable to determine from [his] review of [the 778 document when the 'may expire' statement was removed." (Hr. Trans. I, Doc. 209 at 159 :11–19.)

and 20 and knows their contents are responsive and true. (Hr. Trans. II, Doc. 210 at 40:3–14). But, at the sanctions hearing, Mr. Baker admitted that he had never seen the 778 document (Hr. Trans. II, Doc. 210 at 39:19–24) and did not review the 778 document before certifying that it was responsive to Plaintiff's requests. (Hr. Trans. II, Doc. 210 at 41:18–42:1.) Thus, the fact that the 778 document happened to be included in what amounted to a document dump on Plaintiffs does not exculpate GTL's conduct.

GTL also argues that "if some of the documents identified in response to the interrogatory were not directly responsive, that does not by itself constitute evidence of a deliberate effort to mislead." (Def.'s Post-Hr. Brief, Doc. 221 at 10.) But, *none* of the documents were responsive. Despite GTL's assertion in its response to Interrogatory No. 20 that "the burden of ascertaining an answer will be substantially the same for either party," Plaintiffs were simply not provided the documents necessary to ascertain an answer. Not only were these documents, as GTL now admits not clear on their face, GTL had not provided Plaintiffs with the documents that GTL now cites for the assertion that the statement was removed. GTL effectively sent Plaintiffs on a wild goose chase.  The provision of non-responsive documents again was part of a broader pattern of obfuscation.

> ### d. GTL Made False Representations to the Court in Briefs and Arguments.

Plaintiffs allege that GTL also made materially false representations to this Court in the Parties' Joint Statement (Corr. Joint St., Doc. 141), during the June

55

25, 2018 teleconference (Teleconf. Trans., Doc. 147), and in Response to Plaintiffs' Motion for Class Certification (Resp., Doc. 137).

First, in GTL's portion of the Parties' Corrected Joint Discovery Statement, GTL represented that "the identified documents confirm that the script did not change very much over time, and that the inactivity prompt did not change from 2009 through the date of the Complaint." (Corr. Joint St., Doc. 141 at 7.) This statement is false as the script changed in 2014 and again in 2016. GTL also argued that all of the Plaintiffs would have likely heard the "may expire" statement on the IVR. (*Id.* at 5.) GTL later admitted that this was false in its Notice of Corrected Defendant's Statement. (*See* Not. of Filing Def.'s Corr. St., Doc. 151 at 1) (explaining that "counsel discovered that the inactivity prompt would not have been heard by Plaintiff Benson Githieya when he signed up for his account since the inactivity prompt was not played on calls placed to set up an AdvancePay account after January 2014.")

Second, Plaintiffs allege that GTL's counsel's made false arguments during the Court's teleconference.  Specifically, Plaintiffs contend that GTL's argument that it had conducted an "extensive search and provided all" responsive documents and that "there was nothing else that we can provide . . . that hasn't already been provided . . . " was false. (Mot., Doc. 168 at 17.) (citing Teleconf. Trans, Doc. 147 at 14:23–25; 9:16–17.) The Court agrees.  GTL's statements were inaccurate as GTL had not conducted an extensive search or provided all responsive documents. GTL had not provided the most recent master prompt list or identified any call flow

documents. (*See also* Pls.' Post-Hr. Brief, Doc. 220 at 11, n. 28; Pls.' Mot. for Sanctions, Doc. 168 at 17.)

Third, and most significantly, in opposing Plaintiffs' Motion for Class Certification, GTL repeatedly argued that because "the automated telephone script . . . expressly discloses the inactivity policy . . ." (Def.'s Resp., Doc. 137 at 10) Plaintiffs' "theory of liability is not susceptible to class treatment . . . ." (*Id.* at 23.) This was GTL's primary defense to Plaintiffs' Motion for Class Certification. (*See id.* at 10–11, 13–14, 17, 23, 25–28, 33, 47.) By definition, therefore, this factual and legal issue was a chief focal point of Plaintiff's class certification briefing.

>   *e.  GTL Failed to Comply with the Court's Discovery Order.*

Plaintiffs allege that GTL violated this Court's Discovery Order by "engag[ing] in a strategy of willful ignorance to avoid revealing information that would undermine its defenses." (Pls.' Post-Hr. Brief, Doc. 220 at 12.) Specifically, Plaintiffs argue that Mr. Montanaro was not involved in the script changes; did not know about the change from a fixed- to a variable-deposit prompt before he began preparing for his deposition; and did not adequately prepare for his deposition. Plaintiffs contend that given his lack of involvement and minimal preparation, Mr. Montanaro was ignorant of basic facts. (Pls. Post-Hr. Brief, Doc. 220 at 12–13.) Thus, Plaintiffs allege that GTL violated this Court's discovery order by deliberately presenting an unprepared 30(b)(6) witness who could not provide informed, responsive testimony.

The Court agrees that Mr. Montanaro was unprepared for his deposition and offered testimony that was obfuscating. The Court specifically reopened GTL's 30(b)(6) witness so that Plaintiffs could have an opportunity to question GTL about these changes. The Court was clear in its discovery order when it asked for contextual information and "[a]ny information that clarifies the meaning of documents Defendant has identified as pertaining to AP script changes." (Discovery Order, Doc. 145 at 2.) Yet GTL provided a witness who could not testify to "changes made to the AdvancePay [] script used by Defendant and information related to such changes" (Discovery Order, Doc. 145) GTL failed to comply with this Court's discovery order by providing a 30(b)(6) witness with inadequate knowledge.

First, Mr. Montanaro provided incredible testimony on a key issue, which GTL then converted from corporate to personal testimony, thus, depriving Plaintiffs of their Court-ordered opportunity to question GTL on these changes. Specifically, Mr. Montanaro testified that "GTL was not aware that the inactivity prompt had been removed from its AdvancePay IVR until the last 30 days." (Montanaro Dep., Doc. 152 at 170:12–21; *see also id.* at 172:15–173:22; *id.* at 176:15–179:1.) According to Mr. Montanaro, "it was only within the past 30 days that [GTL] learned" that the prompt was no longer being played. (Montanaro Dep., Doc. 152 at 165:24–166:24.)

Removing the "may expire" statement represented a significant change to GTL's IVR. The "may expire" statement was removed as a part of a significant

overhaul to the IVR system. Apparently, this change likely was in response to the FCC and state regulatory developments focused on the corporate practice of confiscating funds in 'expired' phone accounts. Thus, it is unbelievable that no one at GTL would know that the "may expire" statement was removed from the IVR, *even as the company continued for years to maintain the breakage practice sub silentio*. The three internal emails discussing this change indicate otherwise.[12] (*See* Pls.' Hr. Ex. 324, "GTL_Githieya_0092955") (internal GTL email discussing changes to the IVR deposit prompt); (Pls.' Hr. Ex. 330, "GTL_Githieya_0092780") (internal GTL email confirming implementation of change to deposit function of IVR); (Doc. 152-9, "GTL_Githieya_0093264") (internal GTL email describing the switch to variable-deposit prompt). The Court finds it stunning that after GTL was ordered to provide further 30(b)(6) corporate testimony in connection with the discovery dispute resolved by the Court, GTL then changed a material portion of this witness's testimony from corporate to personal testimony.

Second, GTL's corporate representative (Montanaro) was either unable to testify about *why* the prompt containing the "may expire" statement was removed.[13] Mr. Montanaro was unprepared for his deposition in this case. He was

---

[12] Mr. Montanaro was also not prepared to testify when the "may expire" statement was removed from the Michigan Department of Corrections' IVR and was only able to answer this question after speaking with GTL's counsel during a break during the deposition. (*See* Hr. Trans. II, Doc. 210 at 159:11–160:10; Montanaro Dep., Doc. 152 at 113:24–114:25.)

[13] "Q:   In all of your conversations with GTL personnel, did you learn or obtain any information about why the fixed deposit or 1010 prompt was removed and replaced with the variable deposit prompts?

not involved at all in the decision to remove the "may expire" statement and he did not speak to Mr. Baker or anyone who actually was responsible for making this decision. (*See* Hr. Trans I, Doc. 209 at 163:1-168:3; 223:4-23.) This is especially disingenuous because in the fall of 2013, the Federal Communications Commission (FCC) formally announced its view that inactivity policies like the one at issue here may be unjust and unreasonable and thus unlawful. Report and Order And Third Further Notice of Proposed Rulemaking, WC Docket No. 12-375, 13-113 (2013) at 82–83 (Pls. Hr. Ex. 323). Mr. Montanaro referred to this FCC Order as "one of the seminal moments in the industry." (Montanaro Dep., Doc. 152 at 98:5–14.) While Mr. Montanaro claimed that he was not aware of the portion of the FCC Order, which discussed the inactivity policies, that is immaterial as GTL was certainly aware of the Order.  Additionally, in Alabama, where GTL was founded and maintained a contract with the Alabama Department of Corrections, the Alabama Public Service Commission considered banning inactivity policies in the same general time frame (October 2013). *See* Re: Generic Proceeding Considering the Promulgation of Telephone Rules Governing Inmate Phone Service, 2013 WL

---

A:       No.

Q:       So sitting here today and after full preparation for this deposition, you cannot explain the reason GTL [re]placed the fixed deposit prompt with the variable deposit prompt?

A:       No.

Q:       You can offer no testimony on that topic?

A:       In the conversations that I had with these individuals, nobody could provide an explanation as to why the inactivity element of the prompt was removed."

(Montanaro Dep., Doc. 152 at 23:10–23.)

12214753 at *14, *17–18 (Ala. PSC Oct. 7, 2013). There is no question that GTL was aware of both the FCC's and Alabama Public Service Commission's Orders when GTL removed the "may expire" statement from its script in January 2014 even as it continued to maintain its underlying practice of seizing customers' "expired" funds through its breakage policy.

Third, Mr. Montanaro also testified that GTL's prior representations to the contrary are still true because "[t]he file exists and continues to exist, [it's] just that . . . we stopped playing it on January of 2014." (Montanaro Dep., Doc. 152 at 160:12–15.) But Plaintiffs were not interested in the library of files GTL maintained; Plaintiffs were seeking in discovery what callers actually heard when they called GTL.

Finally, Mr. Montanaro, as GTL's corporate representative, admitted that GTL did not perform any investigation regarding whether the inactivity prompt was still playing despite (1) Plaintiffs' repeated questions through requests for production and interrogatories, (2) Plaintiffs' May 29, 2018 letter to GTL, (3) Plaintiffs' June 6, 2018 email, (4) the Parties' June 14, 2018 Joint Statement to the Court, (5) defense counsel's representations to the Court during June 25, 2018 teleconference hearing that it had investigated this issue, and (6) Defendant's representations in GTL's briefs that the "do not expire" statement was played. (*See*, *e.g.*, Doc. 168-3 at 13); (Doc. 168-4 at 5); (Doc. 168-7 at 4); (Corr. Joint St., Doc. 141 at 7); (Teleconf. Trans., Doc. 147 at 14:23–25). This total lack of a good faith,

proper investigation in responding to discovery requests and briefing — if this testimony can be believed — is extremely troubling to the Court.

      *f.  Through its Defenses, GTL Continued to Obfuscate and Confuse the Issues.*

In GTL's Response to Plaintiffs' Motion for Sanctions and at the Court's Sanctions Hearing, GTL argued that Plaintiffs were simply confused about the terms GTL used. But, throughout this case both sides have used the word "script" to refer to the words that customers heard from GTL's automated line when they called to establish and/or fund an AdvancePay account. (*See*, *e.g.*, Def.'s Resp. to Pls.'s Mot. for Class Cert., Doc. 137 at 10; Pls.'s Mot. for Class Cert., Doc. 123-1 at 9.) But, in Defendant's Response to Plaintiffs' Motion for Sanctions (filed on September 12, 2018), Defendant detoured again, muddying these waters further by manufacturing a distinction between the terms "script" and "recording." According to GTL:

> There has been significant confusion regarding the terminology used to describe the documentation associated with GTL's IVR system and which may have contributed to some of Plaintiffs' misconceptions with GTL's document production. To avoid further confusion, GTL provides the following definitions: [a] "**IVR Recording**" refers to the pre-recorded prompts customers would actually hear whenever they called GTL's main IVR; [b] "**IVR Call Flow**" refers to sets of schematics that show the pre-recorded prompts that were to be played by the IVR Recording at a given time; [c] "**IVR Script**" refers to numerous documents that show pre-recorded prompts that were available to be uploaded and played by the IVR Recording at any given time; and [d] "**IVR Master Prompt List**" refers to the 778' spreadsheet (Dkt. 152-3) GTL produced to Plaintiffs in July 2017 and that identifies the pre-recorded prompt changes GTL made to the IVR Script up to 2017.

(Def. Opp. to Sanctions, Doc. 171 at 8, n. 3) (emphasis in original). Defendant also employed this distinction again during Mr. Montanaro's Deposition and the Court's sanctions hearing. (*See*, *e.g*., Montanaro Dep., Doc. 152 at 159:4–160:20, Hr. Trans. I, Doc. 209 at 151:14–152:12.)

Thus, GTL manufactured a post-discovery distinction between "script" and "recording" despite consistency using the term "script" to refer to the IVR prompts that *actually* played for customers throughout its original briefing in this case, including its class certification briefing. (*See*, *e.g*., Def.'s Resp. to Pls.' Mot. for Class Cert., Doc. 137 at 10 ("Plaintiffs even ask the Court to ignore large chunks of the automated telephone script—the same script that they argue is the contract— which expressly discloses the inactivity policy"), 11 ("Plaintiffs do not dispute that GTL disclosed the inactivity policy in many ways, including in the automated script itself . . . ."), 13, 21, 23, 25, 27, 29, 30, 33.) While the Court recognizes that the titles GTL defines in its Response to Plaintiff's Motion for Sanctions may refer to different types of documents GTL maintains internally and produced during this litigation, it is too late in this litigation to manufacture this gaming distinction. Making the distinction between "script" and "recording" at this late stage is disingenuous, misleading, and obfuscates from the real issues at play. Defendant had an obligation during discovery to adequately define the terms it uses. Thus, this defense is unavailing. Defendant's ever-winding strategy ultimately provides further support for Plaintiffs' contention that GTL intentionally sought to mislead Plaintiffs and the Court.

GTL additionally argued that "despite Plaintiffs' present emphasis on the importance of the 'may expire' statement, the term 'may expire' was not included as a search term in the ESI protocol." (Def.'s Post-Hr. Brief, Doc. 221 at 5.) Thus, GTL maintains that its non-production of the additional Master Prompt Lists, call flow documents, and emails was not in bad faith because their relevance and importance was not apparent. The Court appreciates the challenges of electronic discovery, however under these circumstances whether or not the term "may expire" was included in the agreed upon search terms is beside the point. The central issue here is that GTL did not produce documents or information directly responsive to Plaintiffs' numerous discovery requests regarding what callers actually heard when they called the IVR. GTL's inactivity policy is not a fringe issue in this litigation — the GTL inactivity policy and how it was implemented and communicated to its customers – falls within the factual core of Plaintiffs' Complaint. (*See, e.g.*, Original Compl., Doc. 1 ¶¶ 24–28; Third Am. Compl., Doc. 178 ¶¶ 45-77, 88, 107.) Plaintiffs' documents requests were consistent with this. (*See* Doc. 168-1 at 9) (Requests 26-28.) While Plaintiffs may not have used the "may expire" term at the beginning of this litigation, that is only because the importance of those words was not clear to Plaintiffs until Defendant centrally relied on this in its defense. (GTL Resp. to Class Cert., Doc. 137 at 5; *see also* Pls.' Mot. for Sanctions Ex. G, Doc. 168-7.) Plaintiffs used the terms "inactivity" throughout the litigation and consistently sought discovery on this issue. (*See* Pls. First Request to Produce Docs., Doc. 168-1; Def.'s Resp. to Pls. Third Interrog.,

Doc. 168-3.) Plaintiffs also consistently sought information as to the terms of the script and how GTL communicated its inactivity policy to customers.  GTL's production of out-of-date prompt lists was misleading.  The Court finds that GTL's counsel failed to make a reasonable inquiry before certifying its discovery responses. Nevertheless, GTL's newly retained counsel for the sanctions hearing made overtly clear at the hearing that the responsibility for these disclosure issues fell with GTL, not GTL's counsel. (Hr. Trans. II, Doc. 210 at 105:14–110:10.)

### g. Bad Faith

To impose sanctions under its inherent power, the Court must find that GTL acted in bad faith.

Plaintiffs argue that GTL acted in bad faith by intentionally withholding key documents, providing false testimony,[14] misleadingly identifying documents that were not responsive to an interrogatory, intentionally making false statements to the Court, and purposely presenting an unprepared witness in response to the Court's discovery order whose testimony it later partially disavowed. (Pls.' Mot. for Sanctions, Doc. 168 at 24.) Plaintiffs argue that "GTL's deposition testimony and interrogatory responses were 'so knowingly incomplete and misleading that it

---

[14] Plaintiffs contend in their post-hearing brief that GTL offered false 30(b)(6) testimony during both depositions and the sanctions hearing. Plaintiffs explain that "GTL elicited testimony from Baker suggesting that his testimony was accurate because he simply meant some document titled 'Master Prompt List' was comprehensive—just not necessarily the one that GTL produced and the one Plaintiffs asked Baker about during GTL's deposition." (Pls.' Post-Hr. Brief., Doc. 220 at 7) (citing Hr. Trans. II, Doc. 210 at 87:19–24; 83:4–7.) "GTL also elicited Baker's testimony that he chose not to disclose the removal of the 'may expire' statement because 'it was not an important set of words' — even though those words ultimately became GTL's primary defense to class certification." (Pls.' Post-Hr. Brief., Doc. 220 at 7) (citing Hr. Trans. II, Doc. 210 at 91:3–14.) The Court agrees with this analysis and finds that GTL purposely presented false testimony.

constituted perjury as well as fraud . . . .'" (Pls.' Mot. for Sanctions, Doc. 168 at 24) (citing *In re Amtrak "Sunset Ltd." Train Crash*, 136 F. Sup. 2d 1251, 1258 (S.D. Ala. 2001) *aff'd*, 29 F. App'x 575 (11th Cir. 2001). According to Plaintiffs, each of these actions independently warrant sanctions, but taken together, "there can be little doubt that GTL engaged in bad faith and perpetrated a fraud on this Court by lying about and concealing the fact that the 'may expire' statement was removed from that script years ago." (Pls.' Mot. for Sanctions, Doc. 168 at 26.)

GTL's attempts to explain away its conduct as mere innocent errors ring hollow. GTL argues that Plaintiffs did not prove that GTL *intentionally* withheld documents, provided false deposition testimony, provided false interrogatory responses, and made false statements to the court. (*See generally* Doc. 221.) GTL argues that it never represented that it had produced all responsive documents (Def.'s Post-Hr. Brief, Doc. 221 at 4); that the term "may expire" was not included as a search term in the ESI protocol; and that the withheld documents "did not include any search term and thus were not and would not have been identified by GTL under the ESI protocol." (Def.'s Post-Hr. Brief, Doc. 221 at 4.)

After reviewing the parties' extensive briefing and conducting a two-day evidentiary hearing on this Motion, the Court finds by clear and convincing evidence that Defendant acted in bad faith by intentionally withholding key documents that disclosed the contents of their IVR recording, providing false deposition testimony, false statements to the Court in briefings, false testimony at the sanctions hearing, and then, when confronted with their transgressions,

obfuscating at every turn. The Court looks to the totality and pattern of behavior by Defendant and finds that the imposition of sanctions is appropriate.

GTL has obfuscated important facts and evidence in the discovery proceedings and at the Sanctions hearing. This behavior has multiplied proceedings and led Plaintiffs astray. In this litigation, GTL has clung to the "may expire" statement in the script as providing Plaintiffs with notice of its inactivity policy and as its key defense to liability and class certification. But, this was false. GTL produced an outdated prompt list, which purportedly disclosed the inactivity policy to callers via the "may expire" statement, and then falsely testified that this prompt list was the current script. Mr. Baker also provided false testimony about how GTL conveys the inactivity policy to customers. GTL did not truthfully or fully respond to Plaintiffs discovery requests or interrogatories. While GTL contends that the deficiencies in its interrogatory response were "inadvertent, not deliberate," (Def.'s Post-Hr. Brief, Doc. 221 at 18.) the Court cannot square this excuse with the overwhelming evidence of subterfuge that evinces GTL's plan to conceal. Moreover, Mr. Baker admitted that he had not reviewed critical documents before verifying that these documents were responsive to Plaintiffs' requests. GTL obfuscated with an intent to conceal facts from Plaintiffs and this Court. It did all of this to shield itself from liability through offering falsehoods as facts, patent omissions, and shady handling of discovery and 30(b)(6) depositions.

GTL's Post-Hearing Brief contends that its conduct "is consistent with the inference that GTL reached an erroneous understanding with respect to the IVR

script and labored under that erroneous understanding for several months until it was brought to light by virtue of the very materials that GTL itself previously produced. (Def.'s Post-Hr. Brief, Doc. 221 at 20.)  But GTL is not a stranger to its own corporate practices – practices that also have been litigated elsewhere. First of all, GTL knew — GTL, after all, itself made the change to remove the statement. Then, it intentionally decided to not inform customers of the inactivity policy. Third, and among the most extraordinary of arguments GTL has put forth, GTL argued that the change was "brought to light by virtue of the very materials that GTL produced." (Def.'s Post-Hr. Brief, Doc. 221 at 20.) Again, that is false and directly contradicted by the actual evidence — the change was brought to light by Plaintiffs' counsel placing a phone call to GTL's automated line and then refusing to simply accept GTL's obfuscating excuses and threatening response.

Additionally, in assessing why GTL would engage in the conduct evident in this litigation, the Court cannot ignore that GTL's capacity to maintain its account breakage policy bears financial significance for it.  GTL derives a significant amount of income from its practice of taking funds from accounts that have had no activity. (*See* Pls.' Hr. Ex. 473; Hr. Trans. I, Doc. 209 at 135–136:15.) At the hearing, Plaintiffs argued that breakage was important to GTL's bottom-line and that GTL's decision to obfuscate in this case was directly related to GTL's attempt to hide this policy from its customers and the FCC. (*See* Hr. Trans. I, Doc. 209 at 16:2–15; 78:18–77:6.) According to one GTL executive, "[b]reakage is free money, and I like that." (August 17, 2011 Email from Vance MacDonald, Doc. 123-11 at 2.)

As earlier referenced in the Introduction, GTL records indicate that GTL appropriated over $110 million from customers' AdvancePay accounts pursuant to its inactivity policy.  GTL took this money from over half of the new AdvancePay accounts GTL customers opened (out of 11.5 million new accounts opened, GTL took money from 7.2 million). (McNitt Dep., Doc. 118 at 63:22-24) ("there were 7.2 million unique phone numbers that were broke."); (Id. at 94:15-20.) In an average month, GTL deems approximately 150,000 to 200,000 AdvancePay accounts inactive. (Baker Dep., Doc. 88 at 32:15-18) (testifying that 150,000 to 200,000 accounts go inactive every month).  As GTL has approximately 700,000 active AdvancePay accounts at any given time, GTL closes over twenty percent of its AdvancePay accounts monthly and seizes whatever money remains in these accounts. (Baker Dep., Doc. 88 at 32:9-18.) The average amount of money GTL takes from a customer's account is $6.63. (Baker Dep., Doc. 88 at 130:5-14.) Despite the inactivity policy's import to GTL's bottom line, GTL also hid it from customers and regulators.[15]

The Court is prepared to accept GTL's assumption of responsibility for the course of conduct discussed in this Order, though it cannot understand defense

---

[15] Mr. Baker also sought to distinguish this practice from a formal policy as, according to Mr. Baker, it was really an "accounting practice." (Hr. Trans. II, Doc. 210 at 64:23–25) ("It was a statement of our accounting practices and recordkeeping practices. It had nothing to do with refunds, which is what customers would care about.") He also admitted that "[b]y 2014 we had simply decided that we would try to make the [training documents] better align with the practice. The practice is people can get a refund or reactivate their account at any point in time." (Baker Dep., Doc. 88 at 213:13–17.) He then explained that "advertising 90 days simply caused questions and concerns . . ." (Id. at 215:18–19.) Mr. Montanaro confirmed that in 2014 GTL removed references to the inactivity policy from its training manuals, website, and Terms of Use. (Montanaro Dep., Doc. 152 at 51:21–52:6.)

counsel's failure to cure these repeated deficiencies and misrepresentations promptly. The persistence of GTL's troubling conduct and testimony, all the way though the sanctions hearing, reflects bad faith. The Court could have viewed this also as a Rule 26 violation on the part of counsel, but GTL clearly accepted all responsibility and did not attempt to allocate blame to its counsel. (Indeed, the insistence of defense counsel retained for the sanctions hearing as to this point suggests that GTL may have provided false information to their main counsel.) Still, an attorney has a duty to make a "reasonable inquiry" regarding its responses to discovery requests to ensure that "the conclusions drawn therefrom are reasonable under the circumstances." Fed. R. Civ. 26(g), Advisory Committee Notes. Rule 26(g)[16] authorizes the imposition of sanctions in certain circumstances. Given GTL's assumption of exclusive responsibility for its actions in this matter, the Court views it as the exclusive culpable source of the bad faith course of litigation conduct discussed in this Order, though the entire set of circumstances is troubling.

---

[16] Pursuant to Rule 26(g)(1), every discovery response or objection must be signed by at least one attorney of record in the attorney's own name. Fed. R. Civ. P. 26(g)(1). This signature certifies compliance with the federal rules and the parties' discovery obligations. The comments to subsection (g)(1) clarify that Rule 26(g) broadly "requires that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection." Fed. R. Civ. P. 26(g) advisory committee's note. "The duty to make a 'reasonable inquiry' is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances." *Id.* Thus, for example, Rule 26(g) "requires that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection." *Id.*; *see, e.g., In re Delta/AirTran Baggage Fee Antitrust Litigation*, 846 F. Supp. 2d 1335, 1351–52 (N.D. Ga. 2012) (Batten, J.). Further, Rule 26(g)(3) requires the Court to impose sanctions if a certification violates this rule without substantial justification. Fed. R. Civ. P. 26(g)(3); *see Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir. 1997) (recognizing that the decision to impose sanctions is not discretionary when the Court finds that violation has occurred) (citing *Malautea*, 987 F.2d at 1545).

GTL withheld numerous documents. GTL's 30(b)(6) witnesses lied under oath. GTL based its arguments on these lies and other misrepresentations and intentional non-disclosures.  GTL did all of this to hide from Plaintiffs and the Court that many of the putative class members never had notice of, let alone agreed to, GTL's inactivity policy. And GTL sought to defeat class certification and any effective requested relief in this case based on this course of misrepresentations. The Court finds that this course of conduct, given the evidence presented, constitutes strong evidence of bad faith.

### h. Prejudice to Plaintiffs

Plaintiffs' claims in this case revolve around the contract that they entered into with GTL when they called to set up accounts over the automated line. Thus, the call script that Plaintiffs repeatedly sought is the lynchpin of this case. The key documents and information GTL withheld, GTL's bobbing and weaving, and its deceptive discovery responses and class certification defenses thwarted Plaintiffs' ability to meaningfully obtain information from GTL about the phone script, its handling of these accounts, and issues surrounding class certification.  Defendant's entire course of actions and omissions has prejudiced Plaintiffs' litigation efforts and pursuit of class certification and class remedies.

GTL's conduct has certainly resulted in delays and disruption of this litigation, hampered discovery, and interfered with the implementation of this Court's Discovery Order. *See Malautea v. Suzuki Motor Corp.*, 987 F.2d at 1540 (finding that defendants engaged in an unrelenting campaign to obfuscate the

truth by improperly objecting to interrogatories, providing incomplete, evasive and unreasonably narrow discovery responses, delayed compliance with court orders and thus hampered the discovery process and showed disdain for the court's orders); *Bates v. Michelin N. Am., Inc.*, No. 1:09-CV-3280-AT, 2012 WL 453233, at *20 (N.D. Ga. Jan. 13, 2012). GTL's woefully incomplete production, false testimony, and misleading interrogatory responses have affected the integrity of the legal process. If GTL were able to escape any real consequences for its obfuscating course of discovery and litigation posturing, the discovery and judicial process would be stripped of all integrity and functionality. *See Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985) (listing one of the permissible purposes of sanctions as "deterring others from engaging in similar conduct").

### i. Sanctions

Plaintiffs request that the Court hold GTL in default. (Pls.' Post-Hr. Brief., Doc. 220 at 21.). Alternatively, they request the Court enter an order establishing the existence and terms of GTL's contracts with Plaintiffs and the members of the class (*id.* at 22); or preclude GTL from offering evidence regarding the "may expire" statement (*id.* at 24–25.). Plaintiffs also argue that the Court should strike GTL's class certification brief. (*Id.* at 26.) Finally, Plaintiffs request that the Court order GTL to pay the fees Plaintiffs incurred in their effort to discover the terms of GTL's IVR script and seek relief as to GTL's misconduct. (*Id.* at 27.)

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "A

primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. *Id.* at 44–45; *see also Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993) (court's inherent authority "includes the authority to impose reasonable and appropriate sanctions"). The Eleventh Circuit has instructed that "[t]he severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1305 (11th Cir. 2006). While the misconduct the Court described is serious, it does not warrant the ultimate sanction of default. A less drastic sanction tailored to the specific misconduct at issue is more appropriate. The Court finds that striking GTL's answer and granting a default is not appropriate under these circumstances.

The Court has endeavored to craft a sanction that directly addresses GTL's misconduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) (tasking courts exercising their inherent powers to sanction to act with discretion "to fashion an appropriate sanction for conduct which abuses the judicial process"). GTL's incomplete production and false testimony intentionally led Plaintiffs astray during discovery and litigation of this case. GTL purposefully manipulated evidence and discovery to hide the truth from Plaintiffs and the Court. This conduct was directly related to preventing Plaintiffs from discovering the truth, effectively pursuing their class claims, and using the purported "may expire" language as a shield to block Plaintiffs' motion for class certification and class relief

in this Court.  Defendant's witnesses' dodging testimony at the sanctions hearing continued down this same unacceptable path, as described in detail in this Order. Accordingly, the Defendant's bad faith litigation conduct must be sanctioned and the sanctions remedy must have genuine teeth.  It must impose a sanction that punishes Defendant for its serious bad faith conduct and burdening of the litigation and judicial process, and provide a remedy that serves as a deterrent as well as provide a genuine remedy for Plaintiffs that is properly tailored.

Plaintiffs request that the Court "enter an order establishing the existence and terms of GTL's contracts with Plaintiffs and the members of the class." (Pls.' Post-Hr. Brief, Doc. 220 at 20.) Plaintiffs argue that "[e]stablishing the terms of the class members' contracts with GTL would be particularly appropriate because GTL's misconduct was intended to sow confusion about those contract terms in order to prevent a class from being certified." (*Id*. at 21.) GTL, for its part, contends that

> There is no justification to 'establish' the terms of purported class members' contracts with GTL or to bar GTL from relying on the 'may expire' statement during the period prior to January 2014. For one, such a sanction would improperly alter the evidentiary record for class certification. Moreover, as discussed, Plaintiffs have suffered no lasting prejudice. To the extent the 'may expire' statement is relevant to GTL's pre-2014 liability, precluding GTL from relying on it could result in a sanction out of all proportion to any proven discovery failure by GTL as well as any additional expense incurred by Plaintiffs. No such sanction can be justified in the absence of evidence that GTL acted deliberately.

(Def.'s Post-Hr. Brief, Doc. 221 at 26.)

The Court views the sanction of precluding Defendant from relying on the "may expire" language alone to be insufficient under the circumstances presented here, and for the reasons that follow, this is so even for the pre-2014 contracts. In considering Plaintiffs' requested sanction of establishing the terms of the class members' contracts with GTL, the Court considered the arguments both parties raised in their class certification briefing. In GTL's Response to Plaintiffs' Motion for Class Certification, GTL argued that Plaintiffs cannot establish commonality and predominance because the contracts between the Parties are non-integrated contracts as the IVR script does not include the rate per minute for receiving calls, which are set forth in GTL's contracts with state or federal institutions,[17] and extrinsic evidence regarding formation and intent is therefore admissible. Thus, GTL argues that "[i]n order to understand what the terms of the parties' contracts were and whether they included the inactivity policy, [] the court would need to consider extrinsic evidence, including what each account holder knew about the inactivity policy and whether each putative class member understood their agreement to include only parts of the IVR script." (*Id.* at 30.)  GTL argues that in addition to purportedly learning about the inactivity policy from the "may expire" statement on the IVR (which the Court notes is false for much of the class), Plaintiffs also could have learned about the inactivity policy through

---

[17] *See James v. Glob. Tel\*Link Corp.*, No. 13-4989, 2018 WL 3727371, at \*1 (D.N.J. Aug. 6, 2018); *Glob. Tel\*Link v. F.C.C.*, 866 F.3d 397, 404 (D.C. Cir. 2017); *Mojica v. Securus Techs., Inc.*, No. 5:14-CV-5258, 2018 WL 3212037, at \*2 (W.D. Ark. June 29, 2018), *aff'd in part, appeal dismissed in part sub nom. Stuart v. Glob. Tel\*Link Corp.*, 956 F.3d 555 (8th Cir. 2020).

communications with live operators, written brochures and user manuals, on GTL's website, and in publicly available tariffs. (Def.'s Resp. to Class Cert., Doc. 137 at 11.)

The Court is not persuaded by Defendant's argument. First, as the Court notes in its Order granting the class certification, even assuming the contracts are not fully integrated as to the cost of receiving phone calls, the Court need not ascertain what rate per minute each individual class members' agreed to because Plaintiffs are not alleging that GTL breached this aspect of the contract. Plaintiffs are alleging that GTL took *all* of the money remaining in inactive accounts, regardless of how much was actually used to pay for calls prior to such time.

Second, even for those class members that allegedly heard the "may expire" statement through IVR, there is no evidence that any of the putative class members agreed to the inactivity policy, because no button-press or verbal response was required. As the Arbitrator held in this case, the "terms of use" were not part of the contract in this case for the same reason — the IVR system did not require class members to agree to that statement. *Githieya v. Global Tel*Link Corp.*, JAMS File No. 1440005162, slip op. at 3 (JAMS March 10, 2017) (Westmoreland, Arb.) (Doc. 27-1).

Third, GTL decided in 2014 (before this litigation commenced) to remove references to the inactivity policy in its training manuals, from the frequently asked questions on GTL's website, and from its Terms of Use. (Montanaro Dep., Doc. 152 at 51:21–52:6); (*see also* Baker Dep. Doc. 88 at 161:13–164:20.) Despite GTL's

arguments in its briefing, GTL actually did not include information about the inactivity policy on the website. Mr. Baker testified that GTL provides information about refunds, but not inactivity on its website because "[o]ur formal policy now is we no longer tell customers that accounts will time out after 90-day because they can request a refund at any point." (Baker Dep., Doc. 88 at 168:20–169:7.) Mr. Baker also testified that the terms and conditions refer to the refund policy, but not the inactivity policy. (*Id.*) GTL's conduct in this case furthered a concerted, corporate-level effort to obfuscate the inactivity policy that was a financial engine for the company. To mitigate the Court's sanction based on the fortuitous possibility that some class members may have found out about the may expire language in spite of GTL's disguise efforts here would reward GTL's misconduct.

Finally, the Court more broadly must consider the deterrent nature of the penalty necessary in this case as a whole and the seriousness of Defendant's attempt to manipulate the evidence and the litigation process to evade full truthful discovery as well as a fair class certification review process. If GTL wanted to make the strategic decision to distinguish pre-2014 contracts from post-2014 contracts, hampering its merits efforts on one front to shore them up on another, it would have been a reasonable and ethical litigation and business decision at the time. However, that is not what happened here. Instead, GTL opted to take a chance on deceit and it cannot now, having been caught, backtrack to the "middle way."

Accordingly, the Court enters the following findings and remedial directives, designed to provide an effective and meaningful sanction in this matter without

entering as severe a remedy as default.[18] The Court thus finds these sanctions are sufficiently related to the misconduct which was at issue, because they each directly relate to GTL's entire course of litigation misconduct relating to the inactivity issue. *EagleHospital Physicians v. SRG Consulting, Inc.*, 561 F.3d at 1307 (sustaining the severe sanctions imposed by district court because they were specifically related to the litigation misconduct at issue); *see also, Yaffa v. Weidner*, 717 F. App'x 878, 885 (11th Cir. 2017).

A.   The Court holds that there are valid contracts between the named Plaintiffs and the putative class and GTL. These contracts do not include the "may expire" statement. GTL is precluded from arguing that class members agreed to GTL's so-called inactivity policy. GTL may not argue that Plaintiffs heard about this policy from external sources, such as GTL's call center agents, GTL's website, or GTL's filed tariffs. Moreover, the inclusion of the "may expire" statement in the IVR script is not a bar by itself to recovery on Plaintiffs' unjust enrichment claims. The Court finds that this is the most appropriate sanction as it is tailored to GTL's bad faith course of conduct in discovery and class certification briefing, which even manifested in the testimony presented at the sanctions hearing.

B.   The Court also strikes the portions of Defendant's responses to Plaintiffs' Motion for Class Certification (Doc. 171) that mention or make arguments based on the presence of "may expire" statement. The Court takes note of GTL's pattern of bad faith conduct in this case and, as this misrepresentation was solely GTL's fault, GTL is not allowed to amend its response or file subsequent briefing on this issue.

C.   The Court **ORDERS** the parties to resume mediation with Hunter R. Hughes III to be completed within forty-five (45) days of the entry of this Order, unless the Parties agree upon a different mediator. The Parties shall promptly notify the Court of any scheduling issues for Mr. Hughes or such other mediator. The parties are **DIRECTED** to

---

[18] While it is barred from raising arguments relating to the "may expire" statement or that Plaintiffs agreed to the inactivity policy, GTL has indicated that it has other affirmative defenses it seeks to raise in this case.

file a status report at the conclusion of the mediation indicating whether this matter is resolved.  Defendant shall be exclusively responsible for payment of the mediator's fees and costs.

D.       Finally, the Court finds that Defendant poisoned and burdened the entire discovery and litigation process with its conduct, and the Court therefore **ORDERS** Defendant to pay Plaintiffs for all attorney's fees and costs incurred in discovery, class certification briefing, and litigation of sanctions issues.  The parties' counsel should agree upon a reasonable schedule and method for review and discussion of fees in conjunction with the mediation in this matter.  If the Parties are unable to reach an agreement within twenty (20) days of conclusion of the mediation, Plaintiff may file a Motion for Attorney's Fees.

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Sanctions [Doc. 168] but provides relief consistent with the terms herein.

If mediation proves unsuccessful, the Parties are **DIRECTED** to confer regarding the next steps in the litigation of this case and to submit a Joint Statement regarding such within thirty (30) days of the conclusion of the mediation.[19]  The Court will thereafter conduct a scheduling conference with counsel.

**IT IS SO ORDERED** this 30th day of November, 2020.

Amy Totenberg
**United States District Judge**

---

[19] By docket order on April 3, 2020, the Court temporarily granted Defendant's Motions for Leave to File Matters Under Seal [Docs. 233, 235, 237, and 238] pending the Court's ruling on the Plaintiffs' Motion for Sanctions.  The Court defers further review of that ruling, pending the parties pursuing furthers settlement negotiations.  In the event full scale litigation resumes, the Court will revisit this sealing order.